TRAVENOL LABORATORIES, INC. and Herndon Medical and Surgical Supply, Inc., Appellants,

v.

BANDY LABORATORIES, INC., Appellee.

No. 6036.

Court of Civil Appeals of Texas, Waco.

Oct. 30, 1980.

Rehearing Denied Dec. 4, 1980.

Robert A. Gwinn and Charles L. Perry, Seay, Gwinn, Crawford, Mebus & Blakeney, Dallas, Hilton H. Howell, Naman, Howell, Smith, Lee & Muldrow, P. C., Waco, for appellants.

Charles B. McGregor and David B. Kultgen, Beard & Kultgen, Waco, for appellee.

HALL, Justice.

This is a suit for damages based upon bacterial contamination of three serials of rabies vaccine manufactured by plaintiff Bandy Laboratories, Inc. In the processing of the vaccine, plaintiff's employees used surgeon's gloves manufactured by defendant Travenol Laboratories, Inc., which were sold to plaintiff by defendant Herndon Medical and Surgical Supply, Inc. The gloves were marketed by Travenol and sold by Herndon in sealed packages labeled "Sterile Latex Surgeon's Gloves." Plaintiff asserted the cause of the contamination of its vaccine was microscopic holes in the gloves which permitted bacteria to pass from the hands of an employee into the vaccine during processing. Suit was brought on theories of negligence, products liability, warranty, and deceptive trade practices.

The case was tried to a jury in October, 1978. Plaintiff's motion for judgment based upon the verdict was granted, and judgment was rendered in November, 1978, awarding plaintiff $120,000.00 damages, and attorney's fees totaling $24,000.00. Defendants brought this appeal. We affirm the judgment.

The rabies vaccine produced by plaintiff was "caprine origin, killed virus type vaccine" produced from the brains of goats that had been infected with rabies virus. The rabies virus was transmitted to the goats by injection directly into the brains of the animals. A goat's head was shaved and the skin was painted with iodine. The skin was incised, and a hole was drilled through the skull with a trephine. Live rabies vaccine was then injected hypodermically into the brain through the hole in the skull. After the injection the opening in the skin and skull was again painted with iodine, but the hole was not plugged or covered in any way.

The infected goat was then returned to a holding pen until it developed rabies. When the goat exhibited symptoms of rabies, it was moved to a "downer pen." The goat was held in the downer pen until it was totally paralyzed and perilously near death. As the disease progressed, the animal gradually lost all motor control, staggering at first, and eventually becoming totally paralyzed. The animal also lost all control of its excretory functions and ended lying in animal waste in the downer pen with other infected goats. When the goat was totally paralyzed it was killed, and the virulent brain was removed, frozen, and stored for eventual processing into vaccine by plaintiff.

A "serial" of vaccine manufactured by plaintiff was the quantity made from approximately fourteen "lots" of brains which were "pooled" after processing for the purpose of necessary testing for release for use. The usual number of brains in a "lot" was nineteen. We are concerned here with plaintiff's three vaccine serials numbered 60, 61, and 62.

The processing of the vaccine in the laboratory began with the brains being unfrozen. In a machine which worked much like a kitchen blender, the thawed brains were liquefied and homogenized, and then mixed with a solution containing among other things measured quantities of the preservative "phenol" and the antibiotic "gentamicin." The ratio of brain material to the resulting solution was 40%. This solution was then heated for eight days. The addition of the preservative and the antibiotic and the heating were designed to inactivate and kill the rabies virus and any contaminants that might have been present in the 40% solution and render the solution sterile. Upon completion of the heating, a saline solution was added to the 40% solution, reducing the concentration of brain material to 20%. At this stage of the production the solution contained particles of brain material too large for passage through hypodermic syringes. This material was removed by filtering the 20% solution through a succession of progressively finer screens. The filtered material was delivered into a single steel tank where the lots were combined or pooled into an entire serial. Eventually, the serial was used to fill thousands of small vials called "doses." For example, serial 60 contained enough vaccine to provide at least 60,000 doses.

The bacterial contaminants in the serials in question were identified by an independent laboratory selected by plaintiff as "enterococci," bacteria native to human and animal feces, and "staphylococci epidermis," bacteria found on both human and animal skins. Travenol's laboratory, which tested only serial 60, identified the contaminant as only staphylococci epidermis.

The screening of the vaccine solution and the transfers of the solution from one container to another during the various stages of the processing were accomplished through the use of an instrument called an "Amacon pump." A hollow rod approximately three feet long attached to the pump was inserted into a filled container for withdrawal and transfer to another container. The only technician who handled these transfers was Mr. Andres Menchu. He testified that in order to steady and guide the rod as it was moved from one container to another, it was necessary for his gloved hand to touch portions of the rod which were wet with vaccine. It was plaintiff's contention that the vaccine was contaminated during these transfers. Plaintiff argued that the Travenol gloves worn by

Menchu had microscopic holes in them which allowed bacteria from Menchu's hands to pass through the gloves onto the rod and into the vaccine solutions. Travenol and Herndon defended primarily on the theory that the bacterial contaminants originated in the squalid conditions of the downer pens; that the bacteria infiltrated the goats' brains through the open skull wounds; and that plaintiff's processing was unsuccessful in eliminating the contaminants.

Answering special issues numbered as follows, the jury made these findings:

1. (a) The defendant Travenol's label "Sterile Latex Surgeon's Gloves" on the packages of gloves constituted a warranty to plaintiff of benefits or characteristics the gloves did not have; and

   (b) plaintiff relied upon the warranty.

2. (a) Defendants represented to plaintiff that the gloves in question were of a particular standard, quality or grade when they were not of said standard, quality or grade; and

   (b) plaintiff relied upon such representation.

3. (a) The gloves in question were not fit for the ordinary purpose for which they were manufactured; and

   (b) the sale of the gloves in such condition was a deceptive trade practice.

4. The sale of the gloves in question in their condition was an unconscionable action.

5. The condition of the gloves in question was unreasonably dangerous to the property of plaintiff.

6. Rabies vaccine made by plaintiff and handled by persons using the gloves in question became contaminated so as to be unsuitable for the use for which it was manufactured.

7. Defendant Travenol was guilty of acts or omissions constituting negligence in its manufacture and marketing of gloves in question used by plaintiff.

8. Such negligence was a proximate cause of the damages in question.

12. The defective condition of the gloves in question

    (a) was a producing cause of the contamination of the vaccine; and

    (b) adversely affected plaintiff; and

    (c) was a proximate cause of the contamination of the vaccine.

15. and 16. Before this suit was filed, both defendants had written notice of plaintiff's complaint with respect to the gloves in question.

19. $40,000.00 would compensate plaintiff for its actual damages.

20. Plaintiff should be awarded $100,-000.00 exemplary damages.

21. (a) Plaintiff should recover $16,-000.00 attorney's fees for the trial of the case, and

    (b), (c) and (d) additional attorney's fees totaling $8,000.00 in the event of appeals.

The jury failed to find (special issue 9) that plaintiff was guilty of acts or omissions constituting negligence during the production of the rabies vaccine in question, and failed to find (special issue 13) that plaintiff was guilty of acts or omissions which constituted a misuse of the gloves in question.

Plaintiff moved for judgment on the verdict for $120,000.00 damages (being the jury's award of $40,000.00, trebled), and for the attorney's fees found by the jury. This motion was based upon § 17.50(b)(1) of the Deceptive Trade Practices Act (V.T.C.A., Bus. & C. § 17.41 et seq.) which provided at the time pertinent to this lawsuit that an "adversely affected" consumer who prevailed in his cause of action under the Act was entitled to recover "three times the amount of actual damages" and attorney's fees. The motion was granted. Judgment was rendered awarding plaintiff recovery against the defendants of $120,000.00 damages, plus $24,000.00 attorney's fees, with provisions for appropriate reduction of the attorney's fees in the event the appeals for which they were awarded were not taken.

The judgment also awarded Herndon recovery against Travenol for any sum paid by Herndon to plaintiff in satisfaction of the judgment. This provision is not in question.

In alternative points, defendants assert the evidence is legally and factually insufficient to support any finding of causation against them.

The contamination was discovered when plaintiff was filling serial 60 into the final dose vials. Routine tests of stoppers used to seal the vials showed contamination. Further tests established that stoppers which were sterilized with steam and then handled with Travenol gloves showed contamination, but that stoppers from the same sterilized lot handled with sterile forceps tested sterile. Later tests established that all three serials of vaccine in question were contaminated. The discovery of this contamination coincided in time with the discovery of pinholes in the Travenol gloves at plaintiff's laboratory. Each of the serials was tested for sterility by plaintiff between processing into the 40% solution and dilution of the solution to 20%, and between dilution to 20% and screening and pooling. These tests showed the product to be sterile. Plaintiff took and retained samples of serial 61 after the serial had been finally screened but before it was transferred with the use of the Amacon pump into storage containers for eventual disbursement into the dose vials. After the discovery of contamination, these samples tested sterile. Similarly, serials 60 and 62 were tested immediately after screening and pooling and found to be sterile. Other products required to be sterile were also being processed in plaintiff's laboratory by technicians using Travenol's gloves when serials 60, 61, and 62 were being produced. There was no contamination of these products. However, their processing did not require transfers from and to containers with the Amacon pump and rod, so that the gloved hand of a technician did not come into contact with equipment inserted into the products.

Plaintiff's expert witnesses, Mr. Menchu and Dr. David M. Bandy, expressed the opinion that the contamination occurred at a time when the finished vaccine was being transferred into storage containers through the use of the Amacon pump and rod. Dr. Bandy testified directly: "In my opinion, contamination occurred through holes in the gloves." These opinions were based upon the witnesses' detailed retracing and consideration of the production process, the sterility tests made and their results, and the coincidence of discovery of pinholes in the gloves with the discovery of the contamination. The qualifications of the witnesses to express those opinions were fully established and were not questioned by defendants.

Travenol's expert witnesses conceded that pinholes in the gloves were a possible cause of the contamination, but they held opinions that the contamination resulted from other causes. Suffice it to say there is additional evidence not detailed by us supporting the positions of both plaintiff and defendants.

The issue of causation is generally a question for the trier of fact "(1) when general experience and common sense will enable a layman fairly to determine the causal relationship between the event and the condition; (2) when scientific principles, usually proved by expert testimony, establish a traceable chain of causation from the condition back to the event; and (3) when probable causal relationship is shown by expert testimony." *Lenger v. Physician's General Hospital, Inc.*, (Tex.1970) 455 S.W.2d 703, 706. Furthermore, in a proper case the opinion of an expert alone is legally sufficient evidence of the causal relationship between the condition and the event. *General Motors Corp. v. Hopkins*, (Tex.1977) 548 S.W.2d 344, 349. In our case, the necessary evaluation of scientific principles and problems related to the processing of plaintiff's vaccine and the nature and origin of the contaminants made the case a proper one for the reception of explanations and opinions of experts on the issues of causation. We hold the evidence is legally sufficient to support the jury's findings on those issues. Moreover, considering the whole

record, we conclude the findings are not so contrary to the great weight and preponderance of all of the evidence as to be manifestly unjust.

Defendants assign error to the trial court's award of treble damages, contending they did not have the written notice of plaintiff's complaint prior to suit required by the Deceptive Trade Practices Act for the award of such damages. They assert in alternative points that the jury's findings (the answers to special issues 15 and 16) that defendants did receive written notice before suit are not supported by legally and factually sufficient evidence. Particularly, defendants argue that they did not have written notice of contamination of each of the serials 60, 61, and 62, and that they had no written notice of the amount of plaintiff's damages. All of these contentions are overruled.

At all times relevant to this lawsuit § 17.50A of the Deceptive Trade Practices Act provided that a claimant was not entitled to have his damages trebled "where the defendant: . . . (2) proves that he had no written notice of the consumer's complaint before suit was filed." § 17.50A of the Act was rewritten in 1979 to provide in parts pertinent to our case that the claimant "shall give written notice to the [defendant] at least 30 days before filing the suit advising the [defendant] of the consumer's specific complaint and the amount of actual damages and expenses, including attorneys' fees, if any, reasonably incurred by the consumer in asserting the claim against the defendant."

Plaintiff filed this case on December 19, 1977. Dr. Bandy and Mr. Menchu testified that a report concerning the contamination and the defective gloves was prepared by Menchu in October, 1977, and was delivered by Menchu, at a meeting held on October 31, 1977, to Joe Herndon, defendant Herndon's president, and to Greg Long, defendant Travenol's representative. The three-page report was entitled "Report on Rabies Serial 60." Among other statements, it contained the following pertinent information:

"Our problems originated from [Travenol's] gloves may be considered twofold:

"1. Defective gloves:

If holes are visually undetected, contamination from skin of technician may be introduced to product.

"2. Some gloves appear contaminated.

"In light of the above two considerations, the extent of contamination in current production needs to be evaluated."

The fact that holes and weak spots had been visually detected in "nearly all sizes" of plaintiff's stock of Travenol gloves was also noted in the report.

■■■ § 17.50A of the Deceptive Trade Practices Act at the time applicable to this suit did not prescribe any explicit information to be set forth in the written notice, but merely called for notice of "the consumer's complaint." It was later, in 1979, that § 17.50A was amended to require the written notice to contain "the consumer's specific complaint and the amount of actual damages." Without further detailing of the proof on the question, we hold the evidence was legally and factually sufficient to show that defendants had written notice prior to suit of plaintiff's "complaint" within the meaning of this statute. The nature of plaintiff's claim (definite contamination of serial 60, and the fear of additional contamination of other current production which needed evaluation) and plaintiff's complaint (the contamination was caused by defective gloves, likely through visually undetectable holes in the gloves) were clearly expressed in the written notice even though the dollar–amount of damages and the exact extent of contamination were not specified. It is our view that § 17.50A as then applicable did not require more. This construction not only follows the ordinary significance of the plain words of the statute, but it also meets the legislative mandate set forth in § 17.45 for construing the statute "liberally" to "protect consumers" and "to provide efficient and economical procedures to secure such protection." It is also supported by the fact that the specificity now argued for by defendants was not placed in the statute until the later 1979 revision. De-

**314**

fendants' proposition would give no effect to the revision. Presumably, the Legislature intended to make some change in the existing law when it adopted the amendment, and it is the duty of the courts to give some effect to the amendment. *American Surety Co. of New York v. Axtell Co.,* 120 Tex. 166, 36 S.W.2d 715, 719 (1931); *Texas Bank & Trust Co. v. Austin,* 115 Tex. 201, 280 S.W. 161, 162 (1926). The effect of the revision of § 17.50A, according to the plain import of the language used, was to require the specificity in the claimant's written notice in the particulars now urged by defendants as applicable prior to the revision.

█ Plaintiff pleaded that Travenol's gloves (1) were not sterile and (2) that they had holes in them. Proof was made on both allegations, but there was no evidence that the non–sterile condition of the gloves caused contamination of the vaccine. Defendants assign error to the trial court's failure to limit the causation issues in its charge to the jury to the holes in the gloves. The causation issue on which judgment was rendered was special issue 12. Although defendants leveled several objections to this issue, there was no objection that the issue failed to limit the jury's consideration only to the holes in the gloves. The complaint was therefore waived. Rule 274, Vernon's Tex.Rules Civ.Proc.

Defendants raise other points and contentions. None present reversible error, and all are overruled.

█ Plaintiff contends the court erred in failing to award plaintiff the exemplary damages found by the jury. The complaint is overruled. The judgment rendered by the court was the precise judgment prayed for by plaintiff without reservation in its motion for judgment. This inducement precludes plaintiff from assigning error to the judgment on appeal. *Butler v. Henry,* 589 S.W.2d 190, 192 (Tex.Civ.App.–Waco 1979, writ ref'd n. r. e.); *Rogge v. Gulf Oil Corporation,* 351 S.W.2d 565, 566 (Tex.Civ. App.–Waco 1961, writ ref'd n. r. e.). Therefore, we need not decide whether a successful plaintiff in an action under the Decep-

tive Trade Practices Act may recover exemplary damages along with trebled damages and attorneys' fees, nor other reasons assigned by defendants for overruling plaintiff's contention.

The judgment is affirmed.