**AMERICAN CYANAMID CO., et al., Appellants,**

v.

**Maynard C. FRANKSON and Anita Frankson, Appellees.**

**No. 13–86–127–CV.**

Court of Appeals of Texas, Corpus Christi.

April 2, 1987.

Rehearing Denied June 4, 1987.

Richard L. Josephson, Don Weitinger, Houston, Bert L. Huebner, Bay City, Spencer C. Marke, Houston, for appellants.

Ernest H. Cannon, Sam W. Cruse, Jr., Thomas M. Stanley, Houston, for appellees.

Before NYE, C.J., and KENNEDY and BENAVIDES, JJ.

## OPINION

NYE, Chief Justice.

This is an appeal from a jury verdict awarding appellee Dr. Maynard Frankson damages against Lederle Laboratories, a division of American Cyanamid Company.

Dr. Frankson, a Bay City veterinarian, sustained a generalized head injury when he fell from a horse while training horses for tracking and roping. After he fell, he was dragged by the horse for about thirty feet. After the accident, his behavior became erratic. His physician prescribed different neuroleptic drugs, including Thorazine, Haldol and Mellaril, to attempt to control his behavior. Neuroleptics are a class of drugs which are defined by the medical literature as major tranquilizers. The patient became increasingly difficult to manage. Finally, Dr. Cohen, a psychiatrist, prescribed Loxitane, a neuroleptic drug manufactured by Lederle Laboratories. As a result of the Loxitane therapy, Dr. Frankson claimed that he sustained a permanent movement disorder, known as tardive dyskinesia.

The symptoms of tardive dyskinesia include exaggerated and uncontrolled movements of the face, mouth and other parts of the body. Various witnesses testified that Dr. Frankson drooled, marched and paced constantly. He had difficulty eating and speaking. As a result of his injuries, he brought suit against Lederle Laboratories alleging negligence, and design and marketing defects. He also brought suit against Doctors Levinthal, Cohen and Liss for medical malpractice for tortiously prescribing and administering the drug, and against Beverly Enterprises, a nursing home in which Dr. Frankson had been confined, for negligence. Dr. Levinthal was a neurosurgeon who treated Dr. Frankson with the Loxitane. Dr. Cohen was a psychiatrist who first prescribed the use of Loxitane. Dr. Liss was a rehabilitation specialist from Houston who treated Dr. Frankson.

The jury, by a verdict of ten to two, found liability against Lederle Laboratories based upon negligence and defective marketing and design of the drug Loxitane. The trial court instructed a verdict at the close of the evidence in favor of Dr. Liss. The jury failed to find negligence on the part of Dr. Cohen, Dr. Levinthal or the nursing home. The jury found $2,195,-000.00 in compensatory damages and $500,-000.00 in exemplary damages against Lederle Laboratories for gross negligence. Lederle Laboratories brings sixteen points of error attacking the sufficiency of the evidence, various evidentiary rulings, problems concerning the disclosure of Mary Carter agreements, errors in the jury selection process and the basis for calculation of the prejudgment interest. After carefully considering all the points of error, we affirm the judgment of the trial court.

Appellant argues in its first point that the trial court erred in its allocation of jury strikes. Specifically, the drug company claims that Dr. Levinthal should have been aligned with the plaintiff.

Prior to the voir dire examination, appellant filed a written motion to align the defendant doctors Liss, Cohen and Levinthal with the plaintiff. The drug company claimed that because of settlement offers and agreements, the doctors should have been aligned with the plaintiff for the purpose of exercising peremptory challenges. The trial court allocated nine peremptory challenges to plaintiff Frankson, three to defendant Lederle, three to defendant Dr. Levinthal and three to the defendant nursing home. Defendants Liss and Cohen were aligned with the plaintiff because a settlement was expected during the course of the trial. They received no jury strikes. At the end of voir dire, Lederle again asked the court to realign the sides. The trial court refused.

To determine whether the trial court erred, we consider the pleadings, information disclosed by pretrial discovery, information disclosed during the voir dire examination and other information brought to the attention of the trial court. *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 4–5

(Tex.1986); *Diamond Shamrock Corp. v. Wendt*, 718 S.W.2d 766 (Tex.App.—Corpus Christi, writ requested). The existence of antagonism is not a discretionary matter; it is a question of law determined from the above factors whether any litigants on the same side of the docket are antagonistic with respect to an issue that the jury will be asked to answer. *Patterson Dental Co. v. Dunn*, 592 S.W.2d 914, 919 (Tex.1979).

During pretrial discussions, the trial court learned that defendants Cohen and Liss expected to complete a settlement during the course of the trial. These parties did settle before the case went to the jury. Doctors Cohen and Liss received no jury strikes. The trial court was also informed that Dr. Levinthal offered plaintiff a Mary Carter settlement of $500,000.00 which was not accepted. Dr. Levinthal never settled with the Plaintiff. There was also no settlement agreement between the nursing home and the plaintiff.

Plaintiff's pleadings alleged various acts of negligence against the drug company, the doctors, and the nursing home. There were also allegations of design and marketing defects, and breaches of warranty against Lederle. The defendants filed cross-actions against one another. Dr. Levinthal's cross-action denied his own negligence, but did not specifically assert blame on appellant. During the voir dire examination, plaintiff's attorney made several remarks exculpating all defendant doctors. He indicated that doctors generally rely upon the warnings given by drug companies because they can't know everything. He said that the drug company failed to tell Dr. Levinthal that a patient using Loxitane could develop tardive dyskinesia in the short-term. Plaintiff told the jury that the information provided the doctors by the drug company showed that the drug's side effects were mild and transitory. Plaintiff suggested to the jury that he believed the proof would show that if the drug company had told the doctors that a patient could get tardive dyskinesia in the short-term, the doctors would not have given Frankson the specific drug. He said that the jury would be asked to decide whether the doctors received enough information from the drug company and whether they gave the family enough information about Loxitane.

Dr. Levinthal's voir dire focused primarily on the fact that Levinthal was not negligent. His attorney told the jury that Levinthal treated Frankson according to the information that was provided him by the drug company. He argued that if the evidence showed that there was a higher risk of tardive dyskinesia from head injury, Dr. Levinthal had not been so informed by the drug company. He indicated that several witnesses would testify that the drug company failed to give proper warnings, but none would complain of Dr. Levinthal's treatment of the plaintiff.

Generally, the cases in Texas which have dealt with alignment involved parties on the same side with a common goal. In *Patterson Dental v. Dunn*, the Court held that a four-to-one disparity between sides resulted in a materially unfair trial even though the trial court had correctly concluded that there was antagonism among the defendants which entitled them to additional strikes. The Supreme Court, in *Garcia v. Central Power & Light Co.*, 704 S.W.2d 734, 737 (Tex.1986), held that the affirmative exculpatory representations made by the defendants during voir dire overcame any antagonism evidenced by the pleadings.

■ In this case, the pleadings show that plaintiff was affirmatively seeking recovery against Levinthal, as well as the drug company. Even though it was made clear from the voir dire examination that the focus of the plaintiff's case was on the drug company, Levinthal was at all times an exposed defendant who was potentially liable. The plaintiff sought recovery against the drug company and Levinthal, either singularly or together. We hold that Levinthal was properly aligned as a defendant. We do not believe an offer of a Mary Carter agreement which was not accepted by the plaintiff was enough to shift the balance to align Levinthal with the plaintiff.

■ Next, we consider whether the trial court erred in its allocation of strikes.

Tex.R.Civ.P. 233 suggests that the trial judge allocate strikes so that no party is given an unfair advantage. The trial judge does have discretionary power in allocating strikes. *Patterson Dental Co. v. Dunn,* 592 S.W.2d at 919. Here, the trial judge allocated the strikes at nine per side. There was no real antagonism between the nursing home and either Lederle or Dr. Levinthal. Levinthal and Lederle filed cross-actions against one another, but neither alleged the other was the sole cause of plaintiff's injuries. The evidence before the trial court at the time it made its decision did not show adversity between Levinthal and Lederle concerning the issue of Levinthal's negligence. Levinthal's position throughout the trial was that his actions were based upon the information received from the drug company. Lederle and Levinthal were adverse to one another on the adequacy of warning issues.

The determination of whether the trial court erred in allocation is made at the time it makes its decision and not upon hindsight. *See Garcia v. Central Power & Light Co.,* 704 S.W.2d at 737. Proportioning the strikes may be accomplished by increasing the number allotted a sole party on one side, by decreasing the numbers allotted the multiple parties on the other side, or by both. *Patterson Dental Co. v. Dunn,* 592 S.W.2d at 920. We hold that the information before the trial court at the time it made its decision did not show such a degree of antagonism between Lederle and Levinthal that the trial court's allocation of challenges was an abuse of discretion.

■ Lederle also complains by its first point that the trial court erred in not excusing juror Smith for cause. During voir dire, the parties learned that Phyllis Smith was employed by plaintiff's son's accounting firm as a bookkeeper. She testified that she would feel uncomfortable about being placed on the jury. Smith said that plaintiff's case had not been discussed at the office. She later said that she could listen to the evidence and be fair to both sides. The trial court refused appellant's motion to strike Juror Smith for cause.

Appellant was forced to exercise one of its peremptory challenges on Smith.

A person is disqualified from serving on a jury if he has a prejudice in favor of or against a party in the case. Tex.Gov't Code Ann. § 62.105(4) (Vernon Pamphlet 1987). If bias or prejudice is established, the juror is disqualified by operation of law. *Swap Shop v. Fortune,* 365 S.W.2d 151 (Tex.1963). However, whether or not a particular juror is biased or prejudiced may be a factual determination to be made by the court. To disqualify a juror, it must appear that the state of mind of the juror leads to the natural inference that the juror will not act with impartiality. *Compton v. Henrie,* 364 S.W.2d 179 (Tex.1963). Although the witness testified that she would feel uncomfortable serving on the jury, she also believed that she could listen to the evidence and judge the case with impartiality. In the case of *Preston v. Ohio Oil Co.,* 121 S.W.2d 1039 (Tex.Civ.App.—Eastland 1938, writ ref'd), the Court held that an employee of a party to a lawsuit was incompetent to serve as a juror. Here, Ms. Smith was not employed by a party to the suit, but by a party's son. This would not disqualify her as a matter of law. We do not think that her testimony showed either bias or prejudice as a matter of law. We do believe that the better practice would have been to excuse Ms. Smith from service, but because the trial court did not excuse Ms. Smith, we find no abuse of discretion by the trial court. Appellant's first point of error is overruled.

■ Lederle claims by its second point that the trial court committed reversible error in not disclosing the Mary Carter agreements between the parties. A Mary Carter agreement is a settlement between a plaintiff and some of the defendants giving the settling defendants a financial interest in the plaintiff's recovery. *General Motors Corp. v. Simmons,* 558 S.W.2d 855 (Tex.1977). The traditional Texas rule is that settlement agreements should be excluded from the jury. *Scurlock Oil Co. v. Smithwick,* 724 S.W.2d at 3. However, when a settling defendant retains a financial stake in a plaintiff's recovery, an ex-

ception to the general rule is created. *General Motors Corp. v. Simmons*, 558 S.W.2d 855 (Tex.1977).

At the pretrial hearings, the attorneys for Doctors Cohen and Liss informed the trial court that settlement negotiations were in progress, but no settlement had been reached. The trial court heard testimony during the trial from Dr. Frankson, Mrs. Frankson and Bert Huebner, the guardian ad litem. Each testified that there was no settlement agreement. Several times during trial, the trial court was informed that a settlement had not yet been reached. At the close of evidence, defendants Cohen and Liss disclosed to the trial court that they had entered into a guaranty agreement with the plaintiff.

The trial court's determination of whether a settlement has actually been reached necessarily involves some exercise of discretion. Lederle made frequent complaints to the trial court concerning the existence of a settlement. Each time, the defendants denied that an agreement had been made. We agree with the concurring opinion in *Scurlock Oil Co. v. Smithwick* that the existence of Mary Carter agreements tends to skew the presentation of the case to the jury. We also believe that it is unfair to the non-settling defendant to forestall the mere finalization of an agreement until all of the evidence has been introduced and the case is ready to be submitted to the jury. However, as an appellate court, we cannot "second guess" a ruling of a trial court where the matter is within its sound discretion. The doctors' denials that a settlement had been reached as well as the contents of the record, in which existence of a settlement was denied under oath, prohibit us from finding an abuse of discretion by the trial court.

■ Appellant also argues under this point that the trial court erred in reading various portions of the Mary Carter agreement to the jury, when an agreement was finally reached. The trial judge deleted certain portions of the agreement including an opinion that the damage award would probably reach an amount in excess of twenty-five million dollars and a statement that the defendants wanted to assure that Dr. Frankson receive some recompense.

The purpose of disclosing Mary Carter agreements is to apprise the jury of the settling defendants' financial interest in the plaintiff's recovery. *General Motors Corp. v. Simmons*, 558 S.W.2d 855 (Tex. 1977). We find that the agreement which was read to the jury, although containing certain innocuous self-serving statements, was proper.[1] Error, if any, was not so grave that it was calculated to cause or probably did cause an unfair verdict.

■ Lederle also claims under this point that the trial court erred in not allowing Levinthal to be cross-examined about possible cooperation with plaintiff's counsel. During Lederle's cross-examination of Levinthal, the doctor testified that he had spoken to plaintiff's attorney two or three times, but none of his conversations were directly pertinent to his testimony. Dr. Levinthal later testified, outside the jury's presence, that plaintiff's counsel had been in the room while Levinthal discussed with his attorney the type of questions his attorney would ask.

A trial court has considerable discretion in permitting cross-examination of a witness to show bias or prejudice. *Frank B. Hall & Co., Inc. v. Buck*, 678 S.W.2d 612, 628 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). We believe that in this instance the trial court should have allowed

---

1. The agreement said:

We want to have the opportunity to vindicate the name of our clients, Drs. Cohen and Liss, and even though we believe that our respective clients are not responsible for the past condition and difficulties of Dr. Frankson, as well as his future disabilities, we would nonetheless make the following proposal in order to guarantee a stated payment so that our clients can limit any chance of a personal judgment and as Cohen and Liss are well aware of the uncertainties of litigation and the problems, time and expense associated with review by Appellate Courts, and because they wish to avoid such uncertainties.

And in addition, the probability, if our assessment is correct, that our clients can be freed from the possibility of shouldering any payment.

the questioning, because of the great latitude that should be allowed on cross-examination, but its failure to do so was not reversible error in this case. *See Logan v. Barge*, 568 S.W.2d 863, 870 (Tex.Civ.App.—Beaumont 1978, writ ref'd n.r.e.); *McCane Sondock Detective Agency v. Penland Distributors, Inc.*, 523 S.W.2d 62, 67 (Tex.Civ.App.—Houston [14th Dist.] 1975, no writ).

■ By appellant's third point of error, it claims the trial court erred in allowing the settling defendants to participate in the trial. Appellant also argues that the trial court erred in setting the order of the parties' presentations, and in allowing Dr. Cohen to argue to the jury after a settlement had been reached.

The record showed that Drs. Cohen and Liss had not reached an agreement during the course of the trial. They were not settling defendants who participated at trial. The parties announced their agreement before the case went to the jury. During final argument, Cohen's attorney argued for a verdict against Lederle. Appellant cites *City of Houston v. Sam P. Wallace and Co.* 585 S.W.2d 669 (Tex.1979), for its position that Cohen should not have participated in the trial. In *Wallace*, a coplaintiff had made a secret agreement with the defendant. The City of Houston had no knowledge of the agreement and was surprised during final argument to have its ally suddenly become an adversary. Here, the jury was aware at the time Cohen argued that a settlement had been reached. The jurors were informed that Cohen would be exonerated from payment, depending on the amount of the verdict. This is unlike the *Wallace* case which appeared to the jury as if the co-plaintiff had some sort of revelation during the trial which caused him to change his mind.

Here, the negligence of Cohen was submitted to the jury, and the trial court informed the jury of the settlement. The trial court did not err in allowing Cohen to participate in final argument. *See McAllen Kentucky Fried Chicken No. 1 v. Leal*, 627 S.W.2d 480 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.).

The trial court determined the following order of presentation: Cohen, Liss, the nursing home, Lederle and Levinthal. The order of proof at trial is within the trial court's broad discretion. No error is shown. Appellant's third point of error is overruled.

■ Lederle argues by point of error four that the trial court erred in preventing it from calling and examining Dr. Mary Ellen Hayden, Dr. Frank J. Ayd and Dr. Merren. Dr. Ayd was an out-of-state expert, and Drs. Merren and Hayden reside in Texas.

On September 23, 1985, the trial court entered an order for all defendants to produce for deposition all experts whom they intended to rely upon at trial. The Court further ordered the parties to produce a written report from all experts who were not Texas residents. Defendant Liss specifically designated Mary Ellen Hayden and Cohen designated Dr. Frank J. Ayd. Dr. Cohen designated Dr. Merren as an expert by a letter to plaintiffs. Lederle designated none of the three doctors as experts, but relied upon a statement in its designation that it reserved the right to call all experts designated to testify as witnesses by other parties in the case. Dr. Ayd and Dr. Hayden were subsequently withdrawn as experts and redesignated as consultants. The trial court refused to allow Lederle to call the doctors.

It is well settled that Texas discovery rules provide that a party may be required in answers to interrogatories to identify each person whom he expects to call as a witness at trial. *See Werner v. Miller*, 579 S.W.2d 455 (Tex.1979). The trial judge has the discretion to compel a party to make the determination and disclosure of whether an expert may testify within a reasonable and specific time before the date of trial. Tex.R.Civ.P. 166b(2)(e)(3).

Here, Lederle did not specifically designate Hayden, Ayd or Merren as witnesses. Any "catch all" phrase which designates any other witnesses which any defendant might designate is not sufficient. No abuse of discretion is shown in the trial

court's action. Appellant's fourth point of error is overruled.

By appellant's eighth point of error it claims that the evidence is insufficient to support the jury's finding of inadequate warning, negligence and causation. A manufacturer who knows or should know of potential harm to a user because of the nature of a product is required to give an adequate warning of such dangers. *Bristol-Myers Co. v. Gonzales*, 561 S.W.2d 801 (Tex.1978); *see Gravis v. Parke-Davis & Co.*, 502 S.W.2d 863 (Tex.Civ.App.—Corpus Christi 1973, writ ref'd n.r.e.). In considering a "no evidence" or "insufficient evidence" point of error, we will follow the well-established test set forth in *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex. 1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456 (Tex.1985); *Glover v. Texas General Indemnity Co.*, 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar*, 395 S.W.2d 821 (Tex. 1965); *Allied Finance Co. v. Garza*, 626 S.W.2d 120 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.); Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 Texas L.Rev. 361 (1960).

Frankson alleged the product was defective in three respects: 1) there should have been a warning that Loxitane should not be prescribed for patients with head injuries; 2) Lederle should not have recommended the use of anticholinergic (anti-Parkinson) medications for treating extrapyramidal (temporary movement) side effects associated with Loxitane use; and 3) the warnings should have stated that tardive dyskinesia could occur during short-term therapy as well as long-term therapy. The evidence concerning the adequacy of the warnings given was sharply conflicting. The warnings for the use of Loxitane in 1980 were contained in the 1980 *Physician's Desk Reference* (PDR).

■ Dr. James Cowart, a family practitioner from Bay City, testified that in his opinion Frankson developed persistent tardive dyskinesia as a result of Loxitane use. The information which described the drug indicated that anti-Parkinson drugs could be utilized by a patient taking the drug who developed a temporary movement dis-

order. However, Dr. Cowart believed that administration of the anti-Parkinson drug was inappropriate. According to Dr. Cowart, information available as far back as the 1950's has shown that anti-Parkinson drugs aggravate or increase the severity of tardive dyskinesia symptoms. He relied on a 1973 report written by Dr. Harold Klawans for his opinion that there was evidence that the incidence of tardive dyskinesia was greater in patients receiving anti-Parkinson drugs. A 1978 report by Dr. Granacher indicated that anti-Parkinson agents generally worsen tardive dyskinesia and should be avoided. A 1979 study by Tempur & Haas concluded that tardive dyskinesia could develop in low-dose, short-term use. Dr. Cowart testified that in 1980, it was very important for the drug companies to inform physicians prescribing and using Loxitane that patients with head injuries were pre-disposed to tardive dyskinesia. His conclusions, upon his review of the available literature, were that the warning given by Lederle was inadequate because it did not warn of the risk of giving anti-Parkinson drugs to a patient on neuroleptics, it did not warn of the percentage of patients that will develop tardive dyskinesia in the short term, and it did not warn physicians about neuroleptics and head injuries. Dr. Cowart opined that the failure to give an adequate warning rendered Loxitane unreasonably dangerous as marketed. He said that he believed that the drug company ignored things that they should have considered.

Dr. Charles Bowden, a psychiatrist employed by the University of Texas, testified for Lederle. He stated that he believed there was no increased risk of tardive dyskinesia in patients who have received neuroleptics after receiving a traumatic head injury. Dr. Milton Williams, a psychiatrist from Lake Jackson, testified that neuroleptics are proper in treating a psychotic patient with an organic brain disorder. A letter written to Dr. Stanley Seaton from Dr. Michael Merren, a San Antonio psychiatrist, stated that he was unaware of any increased incidents of tardive dyskinesia in head-injured patients. Dr. Harold Klawans, a neurologist and pharmacologist

from Illinois, testified that he was a specialist in abnormal involuntary movement disorders. He had written several articles on tardive dyskinesia. He testified that the use of anti-Parkinson medications was appropriate when a patient's Parkinsonism is significant. He testified he no longer believed the use of anti-cholinergic drugs would result in a greater incidence of tardive dyskinesia. Klawans also testified that the likelihood of a patient developing tardive dyskinesia in under three months of neuroleptic use was rare, if ever. Dr. Granacher testified at trial that recent medical research does not support the theory that patients with brain damage have a greater risk of developing tardive dyskinesia.

Dr. Levinthal testified that in his opinion Dr. Frankson did not demonstrate symptoms of tardive dyskinesia in December 1980, six months after Loxitane was prescribed. He also said that Frankson's symptoms of difficulty in swallowing, drooling and masked facias appeared before Frankson ever used neuroleptics and in his opinion were consistent with head injuries.

■ The issue of causation is generally one of fact: 1) when general experience and common sense will enable a layman to fairly determine the causal relationship between the event and the condition; 2) when scientific principles (usually proved by expert testimony) establish a traceable chain of causation from the condition back to the event; and 3) when there is a probable causal relationship that is shown by expert testimony. *Lenger v. Physician's General Hospital, Inc.*, 455 S.W.2d 703, 706 (Tex. 1970); *Travenol Laboratories, Inc. v. Bandy Laboratories, Inc.*, 608 S.W.2d 308 (Tex. Civ.App.—Waco 1980, writ ref'd n.r.e.). An expert opinion is legally sufficient evidence to establish a causal relationship between the condition and the event. *See Rodriguez v. Reeves*, 730 S.W.2d 19 (Tex. App.—Corpus Christi, 1987). Producing cause has been properly defined as an efficient, exciting, contributing cause which, in a natural sequence, produced the injuries complained of, if any. *Rourke v. Garza*, 530 S.W.2d 794, 801 (Tex.1975). Proximate cause adds the element of foreseeability. In a negligence case, a party establishes liability by proof that defendant's negligence was a proximate cause of the event; in a products liability case involving a defective product, liability is established by proof that a product was placed in the stream of commerce containing a defect which was a producing cause of the event. *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 732 (Tex.1984).

The evidence outlined herein, although conflicting; amply supports the jury's causation findings. Appellant's eighth point of error is overruled.

By appellant's fifth point of error, it argues that the jury findings of gross negligence and punitive damages are not supported by the evidence. We disagree.

In determining whether there is gross negligence, the same no evidence test previously set forth should apply. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex. 1981). If the jury finds gross negligence, the defendant has the burden of establishing that there is no evidence to support the finding. In determining whether there is some evidence of the jury's finding of gross negligence, the reviewing court must look at all of the surrounding facts, circumstances and conditions, not just individual elements of facts. Texas courts define "gross negligence" as that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the rights or welfare of the person or persons to be affected by it. *Burk Royalty v. Walls; Ford Motor Co. v. Nowak*, 638 S.W.2d 582 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

■ The defendant's state of mind distinguishes gross negligence from negligence. State of mind may be inferred from the defendant's actions. *Williams v. Steves Industries, Inc.*, 699 S.W.2d 570 (Tex.1985). In *Williams*, the Court described the test for gross negligence as both objective and subjective. A plaintiff may prove gross negligence by proving that the defendant had actual subjective

knowledge that his conduct created an extreme degree of risk. A plaintiff may objectively prove a defendant's gross negligence by proving that, under the surrounding circumstances, a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others. Conscious indifference denotes a decision, in the face of an impending harm to another party, not to care about the consequences of the act which may ultimately lead to that harm.

■ Dr. Cowart testified that, in his opinion, Lederle was grossly negligent. He testified that the drug company apparently ignored Dr. Klawans' 1973 report which suggested that, besides prolonging and potentiating tardive dyskinesia, there was evidence to suggest that anti-Parkinson drugs may alter the threshold for the appearance of tardive dyskinesia. In 1978, a report by Dr. Granacher said that giving anti-Parkinson drugs to people on neuroleptics should be avoided. Cowart also testified that before 1980 there were known risks about giving neuroleptics to head-injured patients.

There was evidence that Lederle's warning was approved by the Food and Drug Administration. There was also testimony that a publication by the American Psychiatric Association in 1980 did not contraindicate the use of neuroleptics in patients with head injuries. Dr. Klawans, a professor of neurology and pharmacology at Rush Medical College in Illinois, testified that he had written approximately thirty articles which address the issues of tardive dyskinesia and neuroleptics. He testified that the 1980 PDR adequately warned physicians of the contraindications, risks, adverse reactions and benefits of using Loxitane. While the evidence is certainly conflicting, we find that there was adequate evidence to support the jury's finding of gross negligence. Appellant's fifth point of error is overruled.

■ Lederle complains in its seventh point of error that the trial court committed reversible error in submitting a special issue to the jury which asked:

Do you find from a preponderance of the evidence that Maynard Frankson sustained damages as a result of his treatment with Loxitane?

Lederle offered an alternative issue which the trial court refused. The proposed issue inquired:

Do you find from a preponderance of the evidence that Maynard Frankson developed permanent movement disorders as a result of his treatment with Loxitane?

Lederle argues that the submitted issue allowed the jury to find damages from extrapyramidal side effects or other temporary conditions caused by Loxitane rather than damages for tardive dyskinesia, a permanent movement disorder.

The evidence introduced showed that many neuroleptic medications have the potential to cause temporary movement disorders called extrapyramidal side effects. Lederle warned of this danger. Lederle claims that, because the warnings gave notice of this possibility, they were adequate. The drug company contends that the broadness of the submission allowed the jury to find for the plaintiff on a theory which was not in issue.

Rule 277 of the Texas Rules of Civil Procedure provides:

It shall be discretionary with the court whether to submit separate questions with respect to each element of a case or to submit issues broadly. It shall not be objectionable that a question is general or includes a combination of elements or issues.

The Supreme Court, in recent opinions, has clearly emphasized its approval of broad issue submission. *Island Recreational Development Corp. v. Republic of Texas Savings Association*, 710 S.W.2d 551 (Tex. 1986); *Lemos v. Montez*, 680 S.W.2d 798 (Tex.1984); *Mobil Chemical Co. v. Bell*, 517 S.W.2d 245 (Tex.1974). A trial court is vested with broad discretion in submitting the charge. *De Anda v. Home Insurance Co.*, 618 S.W.2d 529 (Tex.1980). To determine whether an alleged error is reversible, we consider the pleadings, the evidence, and the charge in its entirety. *Island Recreational Development Corp. v. Re-*

*public of Texas Savings Association,* 710 S.W.2d at 555. The first three issues in the charge inquire whether Lederle Laboratories failed to give adequate warnings of the danger of Loxitane. At trial, the dispute between the parties centered upon whether Frankson developed tardive dyskinesia, not whether any demonstrable extrapyramidal effects caused damage. During final argument, Frankson's counsel told the jury that the threshold question was whether Frankson suffered a permanent movement disorder. The record does not reflect evidence or testimony to suggest that plaintiff was attempting to recover for temporary movement disorder. The issue, as submitted, was proper. Appellant's seventh point of error is overruled.

■ Appellant alleges by its ninth point that the trial court committed reversible error by sustaining an objection to its cross-examination of Anita Frankson. The objected to question asked if Dr. Levinthal had told her in 1980 that continued use of Loxitane could cause a permanent movement disorder, would she have asked him to discontinue the drug? The trial court sustained the objection as repetitious. Appellant argues that the question was critical on the issue of causation and Dr. Levinthal's negligence. We disagree. Mrs. Frankson had previously testified that she did not remember Dr. Levinthal informing her that Loxitane could cause a permanent movement disorder. The issue of whether Dr. Levinthal was negligent was before the jury. We agree that the complained-of question was repetitive on this issue. Appellant's ninth point of error is overruled.

In appellant's tenth point of error, Lederle argues that the evidence is factually insufficient to support the jury's findings in response to special issues inquiring whether the negligence of either Levinthal or Cohen proximately caused Frankson's damages. The evidence amply supports the jury's findings.

■ Appellant's eleventh point of error urges that there was no evidence or, alternatively, insufficient evidence to support the submission of lost earnings as part of the damage issue. Special issues 16 and 17 asked the jury to consider the elements of physical pain and mental suffering, loss of earnings, disfigurement and physical impairment in arriving at an assessment of damages. The jury found $750,000.00 damage in the past and $1,000,000.00 for future damages.

There was evidence presented on all aspects of damages. The jury heard that Dr. Frankson's problem caused him to prance and pace constantly. He had trouble controlling his bowels and bladder. He could not eat without great difficulty because of uncontrolled involuntary movements. He had improved at trial, but he was not totally well. It was uncontroverted that he will never be able to return to his veterinary practice. There was sharply conflicting evidence concerning whether the cause of his damage was the drug use or a brain injury which resulted from the initial fall, but both Drs. Cowart and Seaton testified that he would be practicing veterinary medicine today, if not for the drug Loxitane. There was evidence that Dr. Frankson would be earning $65,000.00 a year. An economist testified that Frankson's lost earning capacity in the past was $312,070.00 and in the future was $957,867.00.

It is unequivocally the jury's province to set the amount of damages for those unquantifiable elements such as mental anguish. *Badger v. Symon,* 661 S.W.2d 163 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.); *International Harvester Co. v. Zavala,* 623 S.W.2d 699 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). We have found that there was evidence to support each segment of the damage issue. Appellant's eleventh point of error is overruled.

■ Appellant's twelfth point claims error in admitting evidence of the 1985 PDR warnings for Trilafon and Prolixin, two different neuroleptic drugs. The 1985 warnings for these two drugs showed that they were not indicated for persons suffering from subcortical brain damage. Dr. Cowart testified previously that he believed all neuroleptics were contraindicated in all head injuries. The trial court has consider-

able discretion in admitting or excluding evidence. The two drugs were listed in defendant's literature as being competitive drugs. We find no reversible error in allowing admission of these exhibits. The labels were relevant and were properly admitted. Appellant's twelfth point of error is overruled.

■ Appellant alleges by its thirteenth point that the trial court erred in admitting post–1982 labeling and warnings for Loxitane. We find that the admission was proper on the issue of exemplary damages. Appellant's thirteenth point of error is overruled.

Appellant's fourteenth and fifteenth points claim the cumulative effect of errors by the trial court caused an improper verdict. Appellate courts may not reverse a judgment and order a new trial unless the error amounted to such a denial of appellant's rights that the error was calculated to and probably did cause the rendition of an improper judgment. *Holmes v. J.C. Penney Co.*, 382 S.W.2d 472 (Tex.1964); *Corpus Christi National Bank v. Lowry*, 662 S.W.2d 402 (Tex.App.—Corpus Christi 1984, no writ). We have reviewed all of appellant's points of error singularly and we find no reversible error. We have also considered the combined errors of the trial court and find that the errors do not constitute reversible error. Appellant's fourteenth and fifteenth points of error are overruled.

■ In appellant's sixteenth point of error there is a claim that the trial court erred in its calculation of prejudgment interest on the damage award. Lederle argues prejudgment interest should have been calculated from November 5, 1981, six months after the first suggestion of tardive dyskinesia was made.

The trial judge granted $501,921.75 in prejudgment interest from September 25, 1980, for Dr. Frankson's injuries. The court gave Mrs. Frankson $100,384.35 in prejudgment interest from September 25, 1980. In *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 554 (Tex. 1985), the Supreme Court held that a prevailing plaintiff may recover prejudgment interest on damages that have accrued by the time of judgment. In wrongful death and non-death personal injury cases, interest shall begin to accrue from a date six months after the occurrence of the incident giving rise to the cause of action. Appellant argues that, because May 5, 1981, is the first suggestion of tardive dyskinesia, prejudgment interest should have been calculated from November 5, 1981, six months after the diagnosis. Appellee argues that the evidence shows that Dr. Frankson began to experience a movement disorder in September 1980, and the interest was properly calculated from six months from September 25, 1980. This case is unlike an automobile or industrial accident where prejudgment interest is easily calculated. The "occurrence" in that type of case is undisputed. In this case, the evidence showed that Dr. Cohen prescribed Loxitane on September 25, 1980. It is logical to believe and as such we determine in this case that this date properly constituted the "occurrence" for calculation of prejudgment interest. Appellant's sixteenth point of error is overruled.

We have duly considered all of appellant's points and they are overruled.

The judgment of the trial court is AFFIRMED.

BENAVIDES, J., not participating.

Before NYE, C.J., and KENNEDY and BENAVIDES, JJ.

### OPINION ON MOTION FOR REHEARING

NYE, Chief Justice.

Appellant asks us to reconsider our original holding that the trial court did not err in the alignment or allocation of peremptory challenges.

Our review of a trial court's action in allocating peremptory challenges is limited to the information available to the trial court at the time it makes its decision. Allocation of challenges is to be made in accordance with the ends of justice, so that no party is given an unfair advantage.

Tex.R.Civ.P. 233. The purpose of peremptory challenges is to allow a party to reject certain jurors. *Patterson Dental Co. v. Dunn,* 592 S.W.2d 914 (Tex.1979). If one side of a lawsuit is allowed a grossly disproportionate number of challenges, it allows that party to actually construct the jury. *Id.* at 919. The trial judge may proportion strikes by increasing the number allotted a sole party on one side or by decreasing the number allowed on the other side or both. The Supreme Court has held that while alignment of parties is a question of law, a trial court has discretion in matters of allocation, though it is not unlimited. We perceive this to mean that if the trial court's decision is based upon a reasonable assessment of the situation before it at the time the challenges are made, the decision should remain intact. However, if the trial court has ignored the posture of the parties or has misconstrued or overlooked a vital factor, its decision should be reversed as an abuse of discretion.

In this case, the trial court allocated nine challenges to the plaintiff and three each to defendants Lederle, Levinthal and the nursing home. The trial court had before it the pleadings of the parties which reflect that the appellee was suing the named defendants for negligence. Appellee sued all of the physician defendants for failure to warn him of the risks of using the drug which were set forth in the Physicians Desk Reference. Appellee also alleged design defects, marketing defects and breach of warranty claims against Lederle. The defendants filed various cross-actions. During pretrial hearings, the trial court learned that two defendant doctors were nearing a settlement agreement. They were allowed no peremptory challenges, and were essentially aligned with appellee. The court was also informed that Levinthal had made a Mary Carter settlement offer of $500,000.00 that was never accepted by appellee. Levinthal was aligned with the defendants. We believe that the alignment was proper.

Antagonism among parties and between sides varies by degree from case to case. Here, we have a situation in which Lederle vigorously contested its liability. It claimed that appellee's injuries were caused by his initial fall from the horse. The other defendants also contested their own liability. The record before the trial court showed little antagonism among the three defendants. Each denied that they were liable to appellee, but none sought to fix sole blame upon another at the time the trial court made its decision.

During pretrial hearings, Levinthal and the nursing home told the trial court that they were going to exercise strikes separately. It was clear from the voir dire examination that appellee was focusing his case upon Lederle rather than the other two defendants. However, the other defendants remained in the case and jury issues were submitted concerning their negligence.

This is unlike *Diamond Shamrock Corp. v. Wendt,* 718 S.W.2d 766 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.) which appellant claims conflicts with this case. In *Wendt,* the trial judge knew that neither defendant was really antagonistic to the plaintiff. Each defendant argued that the other defendant was solely responsible for plaintiff's loss, but neither seriously contended that plaintiff should not recover. The trial judge knew, before he allocated strikes, that defendant Medina's Insurance Company had refused to pay. He knew that plaintiff and Medina had discussed proceeding jointly against the insurance company. The judge also knew that plaintiff and Medina had discussed profiles of the type of juror that would be good for both of them. The voir dire bore out a commonality of interest between plaintiff and Medina. We correctly held in that opinion that the alignment of the parties was proper, but the allocation of strikes resulted in an unfair disadvantage to Diamond Shamrock.

In this case, the antagonism exists primarily among sides, not parties on the same side. Lederle and Dr. Levinthal would later become antagonistic on the issue of whether Lederle's warnings were adequate, but this antagonism was not apparent when the trial court made its alloca-

tion. We do not believe that the test should be how this Court would have allocated strikes, knowing what the full record reveals. We believe that the trial court's decision was a reasonable assessment of the situation at the time of its decision.

Appellant's motion for rehearing is overruled.