Paul MOORE, Appellant,

v.

ALTRA ENERGY TECHNOLOGIES INC., Altra Electronic Trading Services, Inc. and DGO, Inc. d/b/a The Ownby Companies, Appellees.

No. 14–08–00362–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 10, 2010.

Billy Shepherd, Stephen R. Bailey, Houston, for appellant.

Joseph A. Garnett, W. Perry Zivley Jr., Richard A. Sheehy, Houston, Darrin Walker, Kingwood, for appellees.

Panel consists of Justices YATES, SEYMORE, and BROWN.

## OPINION

JEFFREY V. BROWN, Justice.

This case was tried to a jury over allegations of common-law and statutory fraud, promissory estoppel, and breach of con-

tract. The jury returned a verdict of $4 million against appellant Paul Moore in favor of appellees Altra Energy Technology, Inc., and Altra Electronic Trading Services, Inc. ("Altra"), on Altra's claim of common-law fraud. The jury also awarded Altra $1.25 million on its breach-of-contract claim against appellee DGO, Inc., d/b/a The Ownby Companies ("DGO"). And the jury awarded DGO $1.25 million in actual damages and $10 million in exemplary damages against Moore for common-law and statutory fraud and promissory estoppel. The trial court reduced the exemplary award to $2.5 million pursuant to Texas Civil Practice & Remedies Code section 41.008 and entered judgment on the verdict. Moore filed this appeal.

Moore's complaints about the judgment include: (1) the trial court erred by failing to realign the parties and properly allocate peremptory strikes; (2) the evidence supporting Altra's fraud claim is legally and factually insufficient; (3) the evidence supporting DGO's common-law and statutory fraud claims is legally and factually insufficient; (4) the evidence supporting DGO's promissory-estoppel claim is legally and factually insufficient; (5) the trial court erred by refusing to submit proportionate-responsibility questions to the jury; and (6) the evidence supporting the jury's punitive-damages award to DGO is legally and factually insufficient. We reverse the trial court's judgment, remand in part for further proceedings in accordance with this opinion, and render in part a take-nothing judgment concerning Altra's fraud claim against Moore.

## I

Altra owned Chalkboard, which is a computer system used to trade commodities on the internet. In 2001, Altra began looking for a buyer who would be interested in purchasing the Chalkboard assets through a stock transaction. David Ownby and his son Daniel Ownby had assisted in developing the Chalkboard technology in the mid–1990s, and Altra contacted them about purchasing it. David's company, DGO, hired attorney Richard Fuqua to raise money to help fund the purchase as well as handle all the legal aspects of the transaction. Fuqua had worked with David on prior business agreements, and he brought in an investor group including Tracy Turner, Moore, and Moore's company, Maroon Bells Capital, LLC.

During trial, the testimony from the witnesses about the series of events leading up to the initiation of the lawsuit varied greatly. It is undisputed, however, that on November 15, 2001, Altra and DGO signed an agreement concerning the terms of the proposed sale of Chalkboard. Altra agreed to negotiate exclusively with DGO until the closing date in exchange for a $250,000 "Break-up Fee"; DGO would pay the fee if it did not execute a final agreement by the closing date. The original closing date was December 13. The agreement also required DGO to provide Altra with a commitment letter that ensured a third party would fund the purchase.

Fuqua, Turner, Moore, and David Ownby ("the Acquirers") engaged Frost Securities, Inc. ("Frost"), to evaluate the feasibility of financing the Chalkboard sale. On November 29, before Frost issued its opinion, Altra and DGO agreed to amend the original agreement to increase the purchase price and delete the closing-price-adjustment clause. In a letter dated November 30, Frost stated to the Acquirers: "[W]e believe that this Acquisition Transaction is financeable under a variety of financing plans .... we are informed by the Acquirers that they have the ability themselves to provide funding in the amount of the purchase price."

Altra employee Dixie Barrett testified that based on the Frost letter, Altra

amended the original agreement for the second time on December 10 to extend the closing date to December 21 as well as eliminate the exclusivity clause. Although Barrett testified the letter was not "strong enough" to be a true commitment letter, Altra claimed it relied on the letter in continuing its discussions with DGO.

David Ownby stated he proceeded with the discussions because Moore continuously urged through his words and actions he was interested in the transaction. David testified that on December 20, before DGO's meeting with Altra, he called Moore to again discuss funding the transaction. According to David, Moore suggested "methods [by] which we could continue the contract," which included increasing the "Break-up Fee" to $1 million. Fuqua and David testified that during their meeting with Altra, they stepped into the hall to call Moore about the transaction. Fuqua stated he explained the situation to Moore, and Moore said he would fund the deal. So the parties amended the agreement for a third time, increasing the "Break-up Fee" to $1 million, changing the closing date to January 31, and requiring DGO to immediately pay $250,000 as a sign of good faith. When Moore testified, however, he denied ever telling David or Fuqua he would fund the transaction. Moore explained he was interested in the transaction, but after conducting his own due diligence, he decided the deal was too risky; therefore, he never agreed to fund anything.

Fuqua wrote a check for $250,000 to Altra to cover the good-faith fee, and he testified Moore had agreed to wire him $250,000 to cover the amount of the check. Fuqua testified Moore never sent or wired Fuqua any money. The check was returned for insufficient funds. Fuqua stated he tried to tender the check for the second time, but it was returned again due to insufficient funds. DGO failed to close the sale by the closing date, and in June 2002, Altra sued David and Daniel Ownby, Fuqua, Fuqua's law firm, and DGO based on a number of claims. Subsequently, Altra added Maroon Bells and Moore to the lawsuit. DGO and Fuqua brought third-party actions against Moore and Maroon Bells.

Before the trial, the court dismissed with prejudice Altra's claims against David Ownby and the Fuqua defendants, but Altra continued to pursue its claims against DGO, Moore, and Maroon Bells. The claims at issue during the trial included Altra's breach-of-contract claim against DGO, Altra's common-law fraud claim against Moore, DGO's common-law fraud claim against Moore, DGO's statutory-fraud claim against Moore, and DGO's promissory-estoppel claim against Moore. After hearing all the evidence, the jury returned a verdict against Moore for $4 million in actual damages in favor of Altra, for $1.25 million in actual damages in favor of DGO, and for $10 million in punitive damages in favor of DGO. The trial court reduced the punitive damages to $2.5 million. Moore timely filed a motion for new trial, but the trial court denied it. This appeal followed.

## II

### Altra's Fraud Claims

Moore's initial issue concerns the trial court's failure to realign the parties or equalize peremptory strikes. But, because they are potentially dispositive of the appeal, we will first address Moore's legal-sufficiency issues. In his second issue on appeal, Moore contends the evidence supporting Altra's fraud claim is legally insufficient to support the jury's verdict. In evaluating legal sufficiency of the evidence, we view all evidence in the light most favorable to the challenged finding and appealed order and indulge every reason-

able inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005); *Harris County v. Vernagallo,* 181 S.W.3d 17, 24 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). We must credit favorable evidence if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *City of Keller,* 168 S.W.3d at 827; *O & B Farms, Inc. v. Black,* 300 S.W.3d 418, 420 (Tex.App.-Houston [14th Dist.] 2009, pet. denied). The fact finder is the only judge of the witnesses' credibility and the weight to give to their testimony. *City of Keller,* 168 S.W.3d at 819; *Vernagallo,* 181 S.W.3d at 24.

We may sustain a no-evidence contention only if the record reflects one of the following: (1) the complete absence of a vital fact; (2) the evidence offered to prove a vital fact is not more than a scintilla; (3) a rule of law or of evidence bars the court from giving weight to the only evidence offered to prove a vital fact; or (4) the evidence conclusively established the opposite of the vital fact. *City of Keller,* 168 S.W.3d at 810; *Prairie View A & M Univ. v. Brooks,* 180 S.W.3d 694, 705 (Tex.App.-Houston [14th Dist.] 2005, no pet.). The evidence constitutes no evidence when the evidence offered to prove a vital fact is so weak as to do nothing more than create a mere suspicion or surmise of its existence; hence, the evidence is no more than a scintilla. *See Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004). More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions as to the existence of the vital fact. *Id.* In other words, the evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the decision under review. *City of Keller,* 168 S.W.3d at 827–28; *Vernagallo,* 181 S.W.3d at 24.

Moore argues the evidence supporting Altra's fraud claim is legally insufficient. He contends the Frost letter, which Altra asserted in its pleadings as the basis for its fraud claim, is comprised not of any representation he made, but only the opinions of Frost-a third party. Moore also complains there is no evidence of any other false representation, or of Altra's reliance on the letter, or of any injury Altra suffered. Moore argues the Frost letter even contains a disclaimer of reliance by third parties without consent from Frost, which Frost never gave. Altra counters by emphasizing that taken together, the Frost letter and Moore's testimony indicate Moore knew Altra would rely on his representation that he could fund the deal. Additionally, in its brief, Altra contends it relied on the false statements that Moore made to DGO. Altra argues Moore knew or should have known his statements to DGO would be repeated to Altra and Altra would rely on those statements.

We must first review what Altra pleaded and tried in relation to its fraud claim.

■ In Altra's live petition, it provides: [Moore] caused [Frost] to issue a letter dated November 30, 2001 which stated that the proposed transaction was financeable and the Acquirers had the ability to provide funding in the amount of the purchase price. [Moore] made these representations with the intent to induce [Altra] to forebear the opportunity to enter into negotiations with other third parties interested in the purchase of the electronic trading business.

It is clear from Altra's pleadings that it did not base its fraud claim on Moore's alleged misrepresentations to DGO. But issues not raised in pleadings can be tried by express or implied consent of the parties, and the issues will be treated as if they had been raised in the party's pleadings. Tex.R. Civ. P. 67; *Pickelner v. Adler,* 229

S.W.3d 516, 523 (Tex.App.-Houston [1st Dist.] 2007, pet. denied); *see also Herrington v. Sandcastle Condo. Ass'n,* 222 S.W.3d 99, 102 (Tex.App.-Houston [14th Dist.] 2006, no pet.) (stating that a trial court cannot enter judgment on a theory of the case that was not pleaded or tried by consent). This rule "applies only where it appears from the record that the issue was actually tried, although not pleaded." *Johnston v. McKinney Am., Inc.,* 9 S.W.3d 271, 281 (Tex.App.-Houston [14th Dist.] 1999, pet. denied); *see also RE/MAX of Tex., Inc. v. Katar Corp.,* 961 S.W.2d 324, 328 (Tex.App.-Houston [1st Dist.] 1997, no pet.) ("Trial by consent is intended to cover the exceptional case where it clearly appears from the record as a whole that the parties tried the unplead issue.... It is not intended to establish a general rule of practice ... and in no event in a doubtful situation.").

■■■ To determine whether an unpleaded issue was tried by consent, we examine the record not for evidence of the issue, but rather for evidence of trial of the issue. *Haas v. Ashford Hollow Cmty. Improvement Ass'n, Inc.,* 209 S.W.3d 875, 883–84 (Tex.App.-Houston [14th Dist.] 2006, no pet.); *McKinney Am., Inc.,* 9 S.W.3d at 281. A party's unpleaded issue may be deemed tried by consent when evidence on the issue is developed under circumstances indicating both parties understood the issue was in the case, and the other party failed to make an appropriate complaint. *Haas,* 209 S.W.3d at 884; *Johnson v. Structured Asset Servs., LLC,* 148 S.W.3d 711, 719 (Tex.App.-Dallas 2004, no pet.); *see La Marque Indep. Sch. Dist. v. Thompson,* 580 S.W.2d 670, 673 (Tex. Civ.App.-Houston [14th Dist.] 1979, no writ). Trial by consent is not applicable when evidence relevant to an unpleaded issue is also relevant to a pleaded issue because admitting that evidence would not elicit an objection; therefore, its admission would not prove the parties' "clear intent"

to try the unpleaded issue. *In re T.S.,* No. 14–05–00348–CV, 2006 WL 1642218, at *6 (Tex.App.-Houston [14th Dist.] June 15, 2006, no pet.) (mem. op.); *Case Corp. v. Hi–Class Bus. Sys. of Am.,* 184 S.W.3d 760, 771 (Tex.App.-Dallas 2005, pet. denied).

■■■ At the outset of the trial, during jury selection, Moore moved to align Altra and DGO. While considering the motion, the trial court asked Altra's attorney what made Altra's case factually diverse from DGO's. Altra's counsel responded, "We're adverse on the breach of contract No. 1. No. 2, our fraud theory is based upon a letter." The trial court then replied, "I hear you. And I understand you, but the inquiry is a step beyond where you're talking. The inquiry is if we agree on the facts and you think it's a breach and he doesn't then that's no factual adversity." Altra's counsel then stated:

> On [its] fraud theory he claims—D.G.O. claims that [Moore] said he would fund the deal. On our fraud theory we claim that [Moore] gave information to a bank that the deal was financeable and—could fund the deal themselves, which was a misrepresentation, false misrepresentation that we relied on and went forward with the deal so fraud, the deal is completely separate.

Thus, as trial was getting underway, Altra informed the trial court that its fraud claim against Moore was based solely on the Frost letter. Altra's statements to the court were consistent with its pleadings.

Furthermore, in Altra's opening statement, it claimed it relied on the Frost letter to its detriment. Even though Altra's attorney also discussed Moore's oral representations to DGO, Altra expressly stated it learned about all of Moore's representations to DGO after it initiated the lawsuit. With regard to Moore's oral statements, Altra seemed to frame its dis-

cussion around what led DGO to sign the contract with Altra, not what led Altra to sign the contract with DGO. More importantly, throughout its opening statement, Altra focused its own fraud argument on the November 30 Frost letter. Specifically, when Altra's attorney was summarizing Altra's claims against Moore, he stated, "We also believe that there will be evidence [Moore] participated in the creation of that November 30, 2001 letter that Altra relied on to its detriment and that was a false statement in that letter according to [Moore] and we were harmed to the tune of $4 million."

Much later, during the charge conference, Moore's counsel objected to Altra's proposed fraud question. Moore's counsel argued there was no evidence of any of the elements of fraud. He then stated, "We also believe as a matter of law Altra could not have relied on the November 30th false securities financial billing letter which is the basis for the fraud claim because that letter expressly disclaims reliance." Altra's counsel did not dispute Moore's statement that the Frost letter was the basis for Altra's fraud claim. From Moore's arguments to the court, it appears as if he believed Altra's claim was based only on the representations in the letter; this indicates he did not believe Altra was pursuing two theories of fraud as it tried the case. *See Haas,* 209 S.W.3d at 884 (holding both parties must understand the issue was being tried in the case).

After reviewing the record, we cannot conclude the parties tried by consent a theory of fraud based on Altra's reliance on representations Moore made to DGO. It is true that Moore never objected to Altra's supposed pursuit of a fraud theory not included in its pleadings. But it makes sense that Moore would see no reason to object to evidence supporting such a theory, because DGO's properly pleaded fraud case consisted of that very evidence. *See*

*cf. Case Corp.,* 184 S.W.3d at 772 (concluding the evidence of the parties' unpleaded claim was relevant to the parties' pleaded claims; hence, the evidence was not developed under circumstances demonstrating both parties understood the issue); *Purselley Indus., Inc. v. C.B. Engle,* 717 S.W.2d 662, 665 (Tex.App.-Tyler 1986, writ ref'd n.r.e.) (holding "the evidence that established that defensive theory conclusively was also admissible under other pleadings in the case not related to the 'alter ego' doctrine"; therefore, the theory could not be tried by consent). Furthermore, the record shows Moore never understood Altra had two theories of fraud. Absent pleading or trial by consent, the trial court could not have granted Altra relief based on any representations Moore made to DGO; the court could have only granted relief for fraud based on the Frost letter. *See Moneyhon v. Moneyhon,* 278 S.W.3d 874, 879 (Tex.App.-Houston [14th Dist.] 2009, no pet.). In conducting our legal-sufficiency analysis, we will review Altra's fraud claim only with regard to the Frost letter.

■ The jury affirmatively answered that Moore committed common-law fraud against Altra. Question 3 instructed the jury on the following elements of common-law fraud:

(1) [a] party makes a material misrepresentation; (2) [t]he misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion; (3) [t]he misrepresentation is made with the intention that it should be acted on by the other party; and (4) [t]he other party relies on the misrepresentation and thereby suffers injury.

The term misrepresentation "means a false statement of fact." Thus, to prevail on its fraud claim, Altra needed to prove: (1) Moore made a material representation that

was false; (2) he knew the representation was false or he made it recklessly as a positive assertion without any knowledge of its truth; (3) he intended to induce Altra to act upon the representation; and (4) Altra actually and justifiably relied upon the representation and suffered injury. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001); *Burroughs v. APS Int'l, Ltd.,* 93 S.W.3d 155, 161 (Tex.App.-Houston [14th Dist.] 2002, pet. denied).

Altra relies on the Texas Supreme Court's decision in *Ernst & Young, L.L.P. v. Pacific Mutual Life Insurance Co.* for the proposition that misrepresentations Moore made to Frost with the expectation that Frost would repeat the statements to Altra may form the basis of Altra's fraud claim against Moore. In *Ernst & Young,* an accounting firm audited a bank's financial statements, and the firm gave an unqualified opinion or report about those statements. 51 S.W.3d at 575. The bank incorporated the auditing report in its annual report and Form 10–K that it filed with the Security and Exchange Commission. *Id.* In soliciting its shareholders to approve a merger, the bank issued three prospectuses, which all contained the Form 10–K, the bank's financial statements, and the accounting firm's auditing report. *Id.* at 575–76. An investor, in reliance on all of the bank's public information and prospectuses, bought notes from the bank. *Id.* at 576. But shortly after the investor completed the transaction, the bank filed for bankruptcy. *Id.* The investor filed suit, alleging the accounting firm knowingly or recklessly made material misrepresentations about the financial health of the bank and the firm intended for investors to rely on the misrepresentation. *Id.* In ruling for the investor, the supreme court held a direct relationship does not have to exist between the fraudfeasor and the object of his deception. *Id.* at 578–80.

Based on *Ernst & Young,* Altra argues a defendant can "commit fraud indirectly when [he] makes a false representation to a third party with the intent or expectation that it be repeated to deceive the plaintiff." *See id.* at 578–80. In relying on *Ernst & Young,* this court has previously concluded a person who makes a false representation may be liable to a third person, to whom the misrepresentation was not directly made, if the person making the misrepresentation had the intent or knowledge that it should be repeated to a third person and intended or knew the third person would act in reliance on the misrepresentation. *Burroughs,* 93 S.W.3d at 162. Thus, a misrepresentation made through an intermediary is actionable if it is intended to influence a third person's conduct. *Ernst & Young,* 51 S.W.3d at 578.

The November 30 letter was signed by William C. Collins, Frost's managing director. Via his deposition, Collins testified at trial that Frost issued the letter to provide certain opinions about the financeability of the Chalkboard transaction. Collins stated it was Frost's opinion that the Acquirers had the ability to fund the amount of the purchase price, and Frost reached that opinion based on information from Turner and Moore. Altra's attorney asked Collins, "What information do you remember getting from either [Turner] or [Moore] that the acquisition was financeable under a variety of financing plans?" Collins responded:

Well, we looked at—as we discussed in the financeability letter, we looked at a sort of financing position of the target, and we—you know, at the time—which was—also energy trading was an extremely attractive area for certain investors and financing sources that that's what—and that's how we came up with that opinion.

Although Collins stated Frost reached its opinion based on information Moore provided, Collins also testified Frost made its decision by combining Moore's information with other sources. Altra's attorney asked Collins, "Did you rely on the information received from Tracy Turner and Paul Moore in order to give truthful representations in the financeability letter which is Exhibit No. 2?" Collins responded, "Yes, but not—not absolutely, not in—just only that information. It was also the information we received on the income statements and the balance sheet, to look at the true—you know, to look at the financial status of the operations; and that coupled with our experience in the market—and especially in the market at the time."[1]

■ This case is simply not on the same footing as *Ernst & Young.* In *Ernst & Young,* the plaintiff relied on the opinion of the alleged fraudfeasor—the accounting firm—which was passed to the plaintiff through a third party—the bank. 51 S.W.3d at 575–76. In this case, Altra purports to rely on the opinion of Frost—a third party. And there is no evidence Frost's opinion was based on any misrepresentation to Frost by Moore. The record is simply devoid of any misrepresentation by Moore contained in either the Frost letter itself or the information Moore allegedly provided Frost for the purpose of preparing the letter.

Besides, Altra's complaint is that Moore misrepresented his *willingness* to fund the deal. The Frost letter offers no opinion about willingness or intent, but merely about Moore's *ability* to fund the deal.[2] Because there is a complete absence of a vital fact—a misrepresentation from Moore—and the evidence offered in an effort to prove the vital fact is less than a scintilla, we conclude the evidence supporting Altra's fraud claim against Moore is legally insufficient. *See City of Keller,* 168 S.W.3d at 810; *See Ford Motor Co.,* 135 S.W.3d at 601. Accordingly, we sustain Moore's second issue, and render a judgment that Altra take nothing by way of its fraud claims against Moore.

### DGO's Fraud Claims

Moore also challenges the legal sufficiency of the evidence relating to DGO's fraud claims.[3] Moore argues the jury's common-law-fraud finding cannot withstand a legal-sufficiency analysis because he never made a false statement to DGO, he never intentionally or recklessly misrepresented his intention to finance the sale, and DGO never reasonably relied on Moore's alleged representation. Moore

---

1. Collins also testified Turner and Moore provided the income statements and balance sheets, but there was no evidence, or even any allegation, that any information contained therein was false or misleading.

2. Collins also testified that he did not have the understanding that Moore would finance the deal himself. When asked if he knew who would provide the financing on this particular deal, Collins replied, "No, we did not." Collins also testified the Acquirers as a group could finance the deal, but he believed Maroon Bells could not finance the deal alone.

3. Moore challenges both of DGO's fraud claims because it is unclear from the trial court's final judgment whether DGO recovered under common-law fraud or statutory fraud. Question 12 of the jury charge provides, "If your answer to Question 5 [common-law fraud] or 6 [statutory fraud] is 'Yes,' then answer the following question. What sum of money, if any, if paid now in cash, would fairly and reasonably compensate DGO, Inc. for the damages, if any, that resulted from such fraud?" Moore objected to Question 12, but not because the question did not make the jury specify which type of fraud it found Moore committed. Thus, if we conclude the evidence supporting DGO's common-law-fraud claim is legally sufficient, we need not discuss whether the evidence of statutory fraud is also legally sufficient because the jury could have assessed damages solely on common-law fraud.

asserts the only evidence that Moore made statements to DGO concerning financing the transaction was his alleged statements to Fuqua. He claims even if he made those statements, DGO did not prove he intended to actually finance the deal. Additionally, he argues DGO did not reasonable rely on his alleged statements because he never spoke with either David or Daniel Ownby, and he never signed any documentation about the transaction. DGO contends, however, that the evidence at trial demonstrated that Moore made several misrepresentations to both DGO and Fuqua.

The common-law-fraud question submitted to the jury is the same as the question submitted to the jury for Altra's fraud claim against Moore, except for the definition of misrepresentation. For DGO's fraud question, "misrepresentation" is defined "as a promise of future performance made with an intent, at the time the promise was made, not to perform as promised." The jury affirmatively answered that Moore committed fraud against DGO.

 "A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998). Proving that a party did not intend to perform "is not easy, as intent to defraud is not usually susceptible to direct proof." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex.2006); *see also Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774–75 (Tex.2009) (per curiam). But intent is a question for the fact finder because it depends on the witnesses' credibility and the weight given to their testimony. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex.1986). The fact that the party did not perform does not alone indicate the party did not intend to

perform when the promise was made. *Id.* at 435. Often intent is derived from "[s]light circumstantial evidence of fraud." *Id.* Additionally, although a party's intent is determined at the time of the representation, the intent may be inferred from a party's acts after the promise is made. *Id.* Hence, one piece of circumstantial evidence is a party's denial he ever made a promise. *Id.*

 Multiple witnesses, including Turner, Moore's only witness, testified Moore gave the impression he was very interested in the transaction, even after he first discussed the deal with David Ownby. There was testimony at trial that Moore visited Altra's facilities to inspect the Chalkboard operations. Daniel Ownby testified Moore continued to request information about Altra into late 2001. Daniel also stated Moore requested that his "financial guy" review everything to make sure the deal was sound. Daniel testified DGO would not have gone forward with the deal with Altra unless DGO believed it had a deal with Moore. He stated, "We signed Amendment 3 to keep the deal going based on the assurance that [Moore] gave us." David Ownby stated he signed the original agreement and the third amendment because Moore continuously expressed his interest and even suggested ways to continue the contract. Like his son, David Ownby testified he relied on Moore's representations, and he would not have signed the deal under any other circumstances.

Fuqua also testified David signed the agreement with Altra because David understood there was going to be financing for the deal from Moore. During Fuqua and David's meeting with Altra, they both testified they stepped into the hall to call Moore about the transaction. Fuqua stated he called Moore to explain the situation, and he said, "You know, we're at a point in

time where Altra is demanding we sign, we don't have the money, we need the money from you before we can sign ... we're not going to sign unless we have the money." Fuqua testified Moore then said, "Tell David to sign the document ... I will fund the deal." After Moore did not deliver the funds, Fuqua stated he asked Larry Ramming, a mutual business associate of Moore and Fuqua, to call Moore and put the call through to Fuqua. Fuqua testified he contacted Moore three times, and each time Moore reaffirmed he was going forward with the deal. According to Fuqua, Moore told him, "This deal will be done ... the money will flow, I'll get this done." Additionally, when Ramming testified, he stated he overheard the phone conversation between Fuqua and Moore in which Moore said he would fund the money for the Altra deal. When questioned at trial, Moore stated he never intended to fund the entire deal, but he also testified he never expressed this sentiment to DGO or its representatives.

DGO also points to the Frost letter as evidence that Moore was interested in financing the transaction as well as evidence that Moore had reason to expect DGO would act in reliance on the representation because DGO was named as one of the Acquirers in the letter. *See Ernst & Young,* 51 S.W.3d at 580 (concluding "the reason-to-expect standard requires more than mere foreseeability; the claimant's reliance must be 'especially likely' and justifiable, and the transaction sued upon must be the type the defendant contemplated").

In his brief, Moore states the trial testimony reflected "an old fashioned swearing match." Throughout Moore's testimony, he denied all the allegations against him and denounced the testimony from Altra's witnesses as completely false. But in evaluating the legal sufficiency of the evidence,

we view all evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller,* 168 S.W.3d at 822. Additionally, we do not step into the shoes of the fact finder because the fact finder is the only judge of the witnesses' credibility. *See id.* at 819; *Texoma Adver. Co., L.P. v. Siblings, L.L.C.,* No. 14–08–00602–CV, 2009 WL 1660619, at *5 (Tex.App.-Houston [14th Dist.] June 16, 2009, no pet.) (mem. op.). It is the fact finder's responsibility to weigh the hotly contested evidence, and although the testimony differs, we will not second-guess the jury's credibility assessment or the weight the jury gives the witnesses' testimony.

Here, there is more than a scintilla of evidence that would enable reasonable and fair-minded people to differ in their conclusions as to the existence of a vital fact. *See Ford Motor Co.,* 135 S.W.3d at 601. The evidence summarized above, when viewed in the light most favorable to the challenged finding, is legally sufficient to support the trial court's judgment in this case. *See City of Keller,* 168 S.W.3d at 827. Because we conclude there is legally sufficient evidence to support DGO's common-law claim, we will not address Moore's complaint about DGO's statutory claim.[4] Accordingly, we overrule Moore's third and fourth issues.

### *DGO's Promissory–Estoppel Claim*

Moore argues DGO's promissory-estoppel claim fails for the same reasons as DGO's fraud claims—the evidence is legally insufficient to prove Moore "promised" to fund the transaction or that DGO reasonable could rely on any alleged promise. DGO contends Moore, through his actions and words, promised to pay the break-up fee and fund the transaction. Further-

---

4. *See supra* note 3.

more, DGO argues Moore's significant interest in the transaction and promise to "fund the deal" led DGO to reasonably rely on Moore's promise.

In the jury charge, Question 4 inquired, "Did DGO, Inc. substantially rely to its detriment on Paul Moore's promise to fund, if any, and was this reliance foreseeable by Paul Moore?" The jury affirmatively answered that Moore made promises to DGO, and it was reasonable for DGO to rely on these promises. Thus, to prevail on its promissory-estoppel claim, DGO had to prove: (1) Moore made a promise to DGO; (2) DGO reasonably relied on the promise to its detriment; and (3) DGO's reliance was foreseeable by Moore.[5] *See English v. Fischer,* 660 S.W.2d 521, 524 (Tex.1983); *Sandel v. ATP Oil & Gas Corp.,* 243 S.W.3d 749, 753 (Tex.App.-Houston [14th Dist.] 2007, no pet.).

The abovementioned common-law-fraud evidence is the same evidence DGO used to prove its promissory-estoppel claim. Like the first and last elements of fraud, the jury found Moore informed DGO it would fund the deal with Altra, and DGO reasonably relied on this promise. Again, although the witnesses' stories differ, it is the fact finder who judges their credibility. *See City of Keller,* 168 S.W.3d at 819; *Texoma Adver. Co., L.P.,* 2009 WL 1660619, at *5. Based on the analysis above, when viewed in the light most favorable to the challenged finding, we conclude the evidence supporting DGO's promissory-estoppel claim is legally sufficient to support the verdict. *See City of Keller,* 168 S.W.3d at 827. Thus, we overrule Moore's fifth issue.

### III

Having addressed Moore's legal-sufficiency arguments, we now return to his primary complaint. In his first issue, Moore complains the trial judge erred because he neither realigned the parties nor equalized the peremptory strikes between the sides. Specifically, Moore contends Altra and DGO were not antagonistic; therefore, they should have been aligned on the same side and together given the same number of peremptory strikes as Moore. Second, Moore complains even if Altra and DGO were antagonistic, the trial court abused its discretion by failing to align them because the degree of antagonism was minimal. Finally, Moore argues if we conclude an error occurred in failing to align the parties or in apportioning the strikes, reversal is required because the error caused the trial to be materially unfair. Both Altra and DGO contend they are not aligned because Altra's active pursuit of its breach-of-contract claim against DGO clearly demonstrates the antagonism between them. Additionally, during voir dire, Altra argued its fraud claim against Moore differed from DGO's fraud claim against Moore; therefore, the parties were factually adverse.

Generally, each party in a civil action in district court is entitled to six peremptory strikes. Tex.R. Civ. P. 233. But in a multiparty case, before allocating peremptory challenges, it is the trial court's duty to decide whether any of the litigants aligned on the same side of the docket are antagonistic with respect to any issue submitted to the jury. *Id.; Garcia v. Cent. Power & Light Co.,* 704 S.W.2d 734, 736 (Tex.1986); *Van Allen v. Black-*

---

**5.** DGO correctly asserts we only need to address the first two elements of promissory estoppel because Moore did not challenge the third element. *See* Tex.R.App. P. 38.1(i) (discussing the party must properly brief each issue). Thus, we will focus our discussion on whether (1) Moore made a promise to DGO and (2) DGO reasonably relied on that promise.

*ledge,* 35 S.W.3d 61, 64 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). The term "side" is not synonymous with 'party,' 'litigant,' or 'person.' Rather 'side' means one or more litigants who have common interests on the matters with which the jury is concerned. Tex.R. Civ. P. 233; *Patterson Dental Co. v. Dunn,* 592 S.W.2d 914, 917 (Tex.1979). If there is no antagonism between litigants on the same side, then each side must receive the same number of strikes. *Garcia,* 704 S.W.2d at 736.

Whether antagonism exists is a question of law for the trial court. *Garcia,* 704 S.W.2d at 736. We review questions of law de novo. *See El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 312 (Tex.1999). In reviewing antagonism, the Texas Supreme Court has concluded that the pleadings alone are not the only factor for courts to consider. *Garcia,* 704 S.W.2d at 736–37; *Dunn,* 592 S.W.2d at 919. To determine if antagonism exists, the trial court must also consider information disclosed by pre-trial discovery, information and representations made during voir dire, and any other information brought to the attention of the trial court before the parties exercise their peremptory strikes. *Id.* at 737; *see Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1, 5 (Tex. 1986) (op. on reh'g). Although parties may have cross-claims or other causes of action against each other, other information brought to the trial court's attention can overcome any antagonism evinced in the pleadings. *Garcia,* 704 S.W.2d at 737. The trial court's antagonism ruling must occur before the exercise of peremptory strikes, but after the litigants complete voir dire. *Id.* at 737; *Dunn,* 592 S.W.2d at 919.

It is also the trial court's duty, after a litigant's timely motion, to equalize the number of peremptory strikes so that any litigant or side is not given an unfair advantage as a result of the alignment and number of peremptory challenges.[6] Tex.R. Civ. P. 233; *Van Allen,* 35 S.W.3d at 64. The nature and degree of the antagonism, and its effect on the number of strikes allocated to each side or litigant, are matters left to the trial court's discretion. *Webster v. Lipsey,* 787 S.W.2d 631, 638 (Tex.App.-Houston [14th Dist.] 1990, writ denied). We review and consider only the information the trial court knew at the time it allocated the peremptory strikes to decide whether the trial court abused its discretion. *Am. Cyanamid Co. v. Frankson,* 732 S.W.2d 648, 653 (Tex.App.-Corpus Christi 1987, writ ref'd n.r.e.). A trial court does not abuse its discretion if its decision is based on a reasonable assessment at the time the challenges were made. *Id.* at 661 (op. on reh'g). But if the trial court ignored the parties' posture, or overlooked or misconstrued a vital factor, then its decision should be reversed as an abuse of discretion. *Id.* The goal is not to give each side exactly the same number of strikes, but to prevent one side, comprised of parties who are adverse on certain factual matters yet united against the other side generally, from controlling jury selection. *See Dunn,* 592 S.W.2d at 920. The Texas Supreme Court has concluded "in most cases a two-to-one disparity between sides would approach the maximum disparity allowable.... [When] the disparity between strikes allowed the two sides did not exceed a two-to-one ratio, courts have held that there was no abuse of discretion." *Id.*

---

6. Both Altra and DGO argue Moore did not move to equalize the peremptory strikes, but only to align the parties; therefore, Moore failed to preserve the issue for appeal. *See* Tex.R.App. R. 33.1(a). From the context of the voir-dire testimony, however, it is apparent that Moore wanted the trial court to align the parties and equalize the strikes. It is equally apparent that the trial court understood what Moore sought.

If the trial court errs, we must determine whether the error resulted in a trial that was materially unfair. *Garcia,* 704 S.W.2d at 737; *Dunn,* 592 S.W.2d at 920. We must examine the entire record during the harm analysis. *Garcia,* 704 S.W.2d at 737; *Dunn,* 592 S.W.2d at 920. Courts have concluded that if the parties have collaborated on the exercise of peremptory strikes such that no double strikes are made, this is some evidence that the parties have used their positions unfairly. *Lopez v. Foremost Paving, Inc.,* 709 S.W.2d 643, 645 (Tex.1986); *see Van Allen,* 35 S.W.3d at 65. Additionally, when the trial is hotly contested and the evidence is sharply conflicting,[7] the error from an improper allocation of peremptory challenges results in a materially unfair trial without showing more. *Garcia,* 704 S.W.2d at 737; *Dunn,* 592 S.W.2d at 920; *Van Allen,* 35 S.W.3d at 66.

In its brief, Altra contends there is antagonism because the pleadings demonstrate it had a claim against DGO, the claim was submitted to the jury, and Altra questioned the jurors only about its claims against DGO and Moore.[8] DGO specifically contends the pleadings indicate there is antagonism between itself and Altra, the issue was submitted to the jury, and there was a common strike between DGO and Altra.[9] Additionally, during oral argument, Altra and DGO argued antagonism can be gleaned from the fact there was an ongoing dispute about attorney's fees between Altra and DGO, Altra still had the burden to prove DGO breached the contract, in its pleadings DGO asserted affirmative defenses against Altra's breach-of-contract claim, and there is a judgment against DGO relating to Altra's breach-of-contract claim. Moore acknowledges Altra's breach-of-contract claim against DGO, but he complains Altra and DGO joined together "to blame Moore for their failure to close the sale from Altra to DGO." Moore points this court to the voir-dire testimony and information known to the trial judge before the parties exercised their strikes to show how Altra and DGO were not antagonistic but aligned on the same side.[10]

Moore relies on *Diamond Shamrock Corp. v. Wendt* for the proposition that when the trial court misallocates the number of peremptory strikes, one side can acquire an "unfair advantage." 718 S.W.2d 766, 770 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.). In *Diamond Shamrock,* Wendt's prized bull, "Superman 1024," died on Medina Valley A.I. Laboratory's premises after Medina's em-

---

**7.** The Corpus Christi court of appeals in *Pojar v. Cifre* notes the trend for courts in reviewing harm is to "focus on whether the trial was 'hotly contested' and the evidence 'sharply conflicting,' rather than on the extent to which an unfair advantage was actually created by the allocation of challenges." 199 S.W.3d 317, 332 (Tex.App.-Corpus Christi 2006, pet. denied). In *Pojar,* the court noted it is hard to imagine a jury trial that is not " 'hotly contested' "; thus, it appears the harmless-error rule has "become a virtual rule of automatic reversal." *Id.* This court, however, follows the general rule finding harm only if there is an actual showing that the trial is "hotly contested" and the evidence is "sharply conflicting." *See Van Allen,* 35 S.W.3d at 66.

**8.** Although Altra argues it asked questions concerning only its claims against Moore, it is apparent from the voir-dire testimony Altra also inquired about DGO's claims against Moore.

**9.** The one common strike between Altra and DGO was a juror that the court had already struck on the record for cause.

**10.** Moore also seeks to rely on information developed after the parties' exercised their peremptory strikes, but as Altra and DGO note in their briefs, we can review only the information the trial court had before the exercising of strikes. *See Garcia,* 704 S.W.2d at 737.

ployees injected it with a Diamond Shamrock-manufactured insecticide. *Id.* at 767. Wendt then sued Medina and Diamond Shamrock and received a judgment against both parties. *Id.* At trial, the trial court refused Diamond Shamrock's request that Wendt and Medina be aligned on the same side, and instead allocated twelve peremptory strikes to Wendt and six each to Diamond Shamrock and Medina. *Id.* at 768. On appeal, Diamond Shamrock complained Wendt and Medina should have been aligned and together received the same number of peremptory strikes as it did. *Id.* at 768. The Corpus Christi court of appeals examined the voir-dire testimony to determine if there was any antagonism between Wendt and Medina. *Id.* at 768–69.

The court noted Wendt and Medina had an apparent common interest, which was to blame Diamond Shamrock for the bull's death. *Id.* at 769. When Wendt discussed gross negligence and punitive damages with the venire panel, it mentioned only Diamond Shamrock and not Medina. *Id.* Wendt and Medina's common theme throughout the voir dire was that Diamond Shamrock's chemical killed Superman. *Id.* Diamond Shamrock, meanwhile, blamed Medina. *Id.* Both Medina and Diamond Shamrock conceded Wendt was not responsible, and neither contended he should not be compensated. *Id.* at 768, 769. Medina never expressly denied negligence, but it did question the venire about requir-

ing Diamond Shamrock and Wendt to prove negligence. *Id.* at 769.

The Corpus Christi court held "the trial court did not err in failing to align Medina and Wendt on the same side." *Id.* at 769. It did so after noting there was "no settlement between any of the parties,"[11] and the plaintiff "was actively seeking recovery against both defendants." *Id.* But the court determined that "[t]he number of peremptory challenges allotted to each litigant presents a different problem." *Id.* at 770. Allocating "twelve strikes to Wendt, six to Medina, whose interests were so closely identified with Wendt's and only six to [Diamond] Shamrock resulted in an unfair advantage to Wendt," and amounted to an abuse of the trial court's discretion. *Id.*[12]

Unlike some of our sister courts, this court has decided few cases concerning antagonism and realignment. *See, e.g., Van Allen,* 35 S.W.3d at 64–65; *Webster v. Lipsey,* 787 S.W.2d at 638–39; *Williams v. Tex. City Refining, Inc.,* 617 S.W.2d 823, 826–27 (Tex.App.-Houston [14th Dist.] 1981, writ ref'd n.r.e). Our most analogous analysis of antagonism is *Webster v. Lipsey.* In that case, Renee Webster was injured in an accident involving a Honda ATC driven by William Lipsey. 787 S.W.2d at 634. Webster sued Lipsey's mother and Honda. *Id.* Honda joined Lipsey as a third-party defendant. *Id.* Before trial, Webster and Honda entered

---

11. The court noted that one scenario that often requires realignment of the parties is when a litigant on one side has settled with a litigant on the other side. 718 S.W.2d at 769 (citing *Scurlock Oil Co. v. Smithwick,* 724 S.W.2d at 5).

12. In the majority of the Corpus Christi court of appeals's cases, the court has decided, absent a settlement agreement between the parties, the parties can show they are antagonistic if one party is actively seeking recovery from the other party. But in *Cecil v. T.M.E.*

*Investments, Inc.,* the Corpus Christi court disagreed with the appellee's contention that its cross-claim established antagonism as a matter of law, even though prior cases suggested "antagonism lies in the allegation of another defendant's sole causation of plaintiff's harm." 893 S.W.2d 38, 55 (Tex.App.-Corpus Christi 1994, no pet.). The court stated, "[T]he trial court must consider all the information brought to its attention and make the antagonism determination within this broader context." *Id.*

into a settlement to limit Webster's recovery from Honda to $7.5 million. *Id.* at 635. On appeal, Lipsey's mother argued that the trial court should have aligned Webster with Honda because of their common cause of action against the Lipseys or the trial court should have properly allocated the peremptory strikes. *Id.* at 638. Despite the settlement, this court held there was sufficient antagonism between Webster and Honda because during voir dire, Webster's attorney discussed the product defect with the venire, and Honda expressly stated it was resisting any defect finding. *Id.* at 639. Additionally, we noted the defective-design issue was submitted to the jury.[13] *Id.*

■ Here, it is undisputed that Altra had a claim against DGO for breach of contract. But as the Texas Supreme Court emphasized in *Garcia v. Central Power & Light Co.*, we must consider not only the pleadings, but also information disclosed by pre-trial discovery, information and representations made during voir dire, and any other information brought to the attention of the trial court before the parties exercise their peremptory strikes. *See* 704 S.W.2d at 737. As demonstrated in both *Lipsey* and *Diamond Shamrock*, courts often review the information and representations the parties make during voir dire. *See Lipsey*, 787 S.W.2d at 638–39; *Diamond Shamrock Corp.*, 718 S.W.2d at 768–69; *see also Frankson*, 732 S.W.2d at 652 (discussing the parties' statements made during voir dire as well as the direction of their voir-dire examinations); *Frank B. Hall & Co. v. Beach, Inc.*, 733 S.W.2d 251, 256–57 (Tex.App.-Corpus

Christi 1987, writ ref'd n.r.e.) (discussing the information provided in the pre-trial hearing and voir dire). Moore argued in both his brief and during voir dire, however, that the trial court should also review the parties' pre-trial filings. Indeed, a review of the pre-trial information in this case reveals several similarities indicating a lack of antagonism between Altra and DGO.

■ First, Altra and DGO have virtually identical witness lists; the only exception is that DGO included its attorney on its list. Second, in Altra's proposed jury questions, it submits questions about whether Moore committed common-law or statutory fraud against DGO; whether Moore made a negligent misrepresentation on which DGO justifiably relied; and whether DGO substantially relied to its detriment on Moore's promise to fund the transaction. Third, Altra proposed several damages questions related to DGO's claims against Moore. Fourth, Altra's and DGO's "Tenders from Deposition of Paul Moore," "Tenders from Deposition of Tracy Turner," and "Tenders from Deposition of William C. Collins, II" are exactly the same. Altra's and DGO's motions in limine are also virtually identical. Finally, in Altra's "Brief in Support of Exclusion of Prior or Subsequent Contracts of Defendant," which is included among its pre-trial filings, Altra never mentions its claim against DGO in the factual background or even charges that DGO failed to abide by the contract. Although Altra notes DGO signed an agreement to purchase Chalkboard, Altra focuses not on its claims

13. Although courts, including this court, *see Lipsey*, 787 S.W.2d at 639, have looked to see whether the parties' claims were submitted to the jury, this analysis seems to contradict the rule that in reviewing antagonism, an appellate court can only review what the trial court had before it prior to making its alignment ruling. *Garcia*, 704 S.W.2d at 737; *Dunn*,

592 S.W.2d at 919. Appellate courts can consider proposed jury questions, but they should not rely on the fact a question was actually submitted to the jury because a trial court would not have known that was going to occur until later in the trial. We, therefore, will not consider this factor in our analysis.

against DGO, but on its claims—and DGO's claims—against Moore.

It is also remarkable how DGO's and Altra's pre-trial submissions evolved with the passage of time. DGO and Altra were first required to comply with the trial court's trial-preparation order in September 2003, and then again in April 2004, both before Moore was a party to the lawsuit.[14] The last set of trial-preparation materials was filed in February 2007, after Moore had been added as a party.[15] The first two sets of submissions reflected a stark antagonism between Altra and DGO at that time. Specifically, the proposed jury questions DGO submitted in 2003 and 2004 included multiple affirmative defenses to Altra's breach-of-contract claim. But in its final pre-trial materials, filed after Moore had been added as a party, DGO submitted none of its affirmative defenses. DGO continued to include the defenses in its pleadings—a point DGO cites as proof it was still antagonistic toward Altra. But by not including the defenses in its proposed jury charge, DGO abandoned them. *See Akin v. Dahl,* 661 S.W.2d 911, 913 (Tex.1983) (stating that an affirmative defense not submitted to the jury is waived); *see generally* Tex.R. Civ. P. 279. Thus we do not consider DGO's defenses as evidence of antagonism between it and Altra. Indeed, the exclusion of the defenses from DGO's proposed jury charge is further evidence that DGO and Altra were not in fact antagonistic.

We next turn to the parties' voir-dire examinations for evidence of antagonism. During his examination, Altra's attorney told the venire panel, "[W]e had a contract with [DGO], and we are suing them for breach of contract because the sale did not go through." Altra's counsel then briefly described the written contract and explained the liquidated damages of $1.25 million. He then added: "Simple as that. We had a contract, they breached it. We're suing [DGO] for the money." Altra then spent the remainder of its time discussing its fraud claim against Moore.

DGO's attorney began his voir-dire examination this way:

[Altra's attorney] explained to you a little bit about this case, and told you that this case was over a contract to purchase Altra, and D.G.O. was the company that contracted to purchase Altra and that is a fact. As part of that, there are certain funds that were required to be undertaken as a part of that contract. That funding was to be provided by Mr. Moore, Mr. Paul Moore.

DGO's attorney did not dispute the existence or terms of the contract, or deny that DGO had breached the contract. Instead, he briefly noted that Altra had sued DGO for breach of contract, and then immediately turned his focus on Moore. He discussed oral promises with the venire panel, but only after noting that "[Altra's attorney] spoke a little bit about oral promises, and I know that some of you had some strong feelings about whether a contract had to be in writing." He mentioned Altra's contract claim against DGO only one other time:

Well, we have two claims in this case: we're defending a claim against Altra for breach of contract but we also have a

---

**14.** The litigation began simply enough in June 2002 when Altra sued DGO and its principals, David and Daniel Ownby. In 2003, Altra added Fuqua and his law firm, and then Maroon Bells about a year and half later. DGO and Fuqua then brought in Moore. Altra made its first claims against Moore in its Ninth Amended Petition in May 2005.

**15.** In 2006, Altra reached settlements with the Ownbys, Fuqua, and Fuqua's law firm and dismissed its claims against them. The only parties remaining at the time of trial were DGO, Altra, and Moore.

D.G.O. claim against Mr. Moore, what's called promissory estoppel ... If you make a promise and somebody relies upon that promise, and you don't live up to it and they take action in reliance on that promise, and then they suffer damages ... Does anyone have a problem with that type of legal claim in the absence of a written contract?

Once the general voir-dire examinations were complete, the trial court called in some of the venire members for individual examinations. Only Altra's attorney and Moore's attorney asked the venire members any questions at this time; Altra's attorney's first question concerned whether the potential juror could follow an instruction that might lead to DGO recovering damages for reliance on a broken promise. Altra's counsel then repeatedly asked jurors about oral promises, reliance, and contracts not in writing, even though its contract with DGO was in writing. At one point during voir dire, the trial judge seemed confused about Altra's claims and even asked its attorney if Altra had a breach-of-contract claim in the case. After Altra's attorney responded, "Yeah," the following discussion occurred:

The Court: Wait a minute. Hold up.

[Altra's attorney]: There's a promissory-estoppel claim left in the case that D.G.O. has.

[DGO's attorney]: That's our claim, Your Honor.

The Court: Okay so, because I'm not feeling well today and because I'm probably even slower than normal, was that a yes or no?

[Altra's attorney]: When you—I hate to be lawyer-like, but when you say do you have a breach of contract claim in this case: Yes, we do, against D.G.O.

[Moore's attorney]: And they're a party to the contract and there's a claim in writing; so, there's no claim of contract.

The Court: Which is what I was getting to.

[Altra's attorney]: But there is a party in this case that does have a claim based upon an oral promise and that's D.G.O. on promissory estoppel theory, whole foundation theory can be based upon oral representation.

The Court: That's different from the contract theory. We've been talking to these jurors about written contracts and agreements and I agree with all that, but that's a different scenario.

[Altra's attorney]: My question has been narrowly tailored to promissory estoppel.

The trial judge moved on, and Altra continued to ask questions concerning oral promises and whether contracts needed to be in writing—questions "narrowly tailored to promissory estoppel."

Altra, of course, sued no one for promissory estoppel. The only promissory-estoppel claim is DGO's against Moore. From this exchange, Altra appears to be arguing DGO's promissory-estoppel claim for DGO, focusing on oral promises in unwritten contracts. In its brief, Altra claims these "questions were about oral promises to perform, which were relevant to Altra's fraud claim against Moore."[16] But during voir dire, Altra's attorney told the trial judge his questions were "narrowly tailored to promissory estoppel." Litigants who are antagonistic toward each other do not spend valuable voir-dire time advocat-

16. The following is an example of the type of question Altra's attorney was asking potential jurors: "Assume at the close of evidence in the case the judge asks you a question that allows somebody to recover damages based upon a broken oral promise, will you be able to render your verdict based upon the evidence or would you unequivocally require a contract in order to render a verdict in the case?"

ing the viability of the opponent's claims. Altra's attorney's voir-dire examination in support of DGO's promissory-estoppel claim is evidence the two parties were cooperating and were not antagonistic.

Shortly after the trial judge asked about Altra's breach-of-contract claim, Moore's attorney moved to align the parties. In the motion, Moore's attorney stated Altra and DGO had submitted the same motions in limine, same witness lists, and same depositions. Moore urged that DGO's attorney never argued anything separately from Altra's counsel, and Altra's attorney had been arguing a promissory-estoppel claim which belonged to DGO. Moore's attorney also informed the trial court of a settlement agreement between Altra and David Ownby.

After Moore moved to align Altra and DGO, the trial court asked Altra's attorney how it was factually adverse from DGO. Altra's counsel responded,

On fraud theory he claims—D.G.O. claims that Paul Moore said he would fund the deal. On our fraud theory we claim that Paul Moore gave information to a bank that the deal was financeable and—could fund the deal themselves, which was a misrepresentation, false misrepresentation that we relied on and went forward with the deal so fraud, the deal is completely separate. And, of course, breach of contract is a different issue.

Noting that each party was pursuing its fraud claims under different theories, however, does not show that the parties are themselves antagonistic. Altra and DGO were not challenging each other's version of the facts; they were merely each relying on different facts to support their particular claims. Nothing about Altra's fraud claims conflicted with DGO's. The jury could adopt Altra's version of the facts and DGO's version of the facts and they could still both win. Indeed, that is exactly what happened. Unlike in *Lipsey*, DGO never expressly denied it breached the contract. Nor did DGO state it should not have to pay damages based on the breach. *See* 787 S.W.2d at 634. This case is more analogous to *Garcia*, as both Altra and DGO were blaming Moore for the failure of the deal. *See Scurlock Oil Co.*, 724 S.W.2d at 5 (citing *Garcia*, 704 S.W.2d at 736). Even though Altra asserted a breach-of-contract claim against DGO, information disclosed to the trial court by pre-trial discovery, information and representations made during voir dire, and any other information brought to the trial court's attention, including the lack of antagonism gleaned from the pre-trial filings, overcame any antagonism evinced in the pleadings. *See Garcia*, 704 S.W.2d at 737. As a matter of law, the trial court should have aligned Altra and DGO and given each side the same number of strikes.

Altra and DGO both argue that even if the trial court should have aligned the parties, the error was harmless. But as we have held in prior cases, when the trial is hotly contested and the evidence is sharply conflicting, the error from an improper allocation of peremptory challenges results in a materially unfair trial without showing more. *Van Allen*, 35 S.W.3d at 66. There was a unanimous verdict, but there were also denied motions for summary judgment, thirteen questions submitted to the jury, and a denied motion for a directed verdict. *See Marcum*, 2008 WL 2388073, at *4 (citing *Dunn*, 592 S.W.2d at 921).[17] Altra and DGO contend the trial

---

**17.** Factors that indicate a hotly contested trial can include whether the verdict was unanimous, the number of questions submitted to the jury, and whether there was a motion for an instructed verdict or motion for summary judgment. *Marcum v. Marcum*, No. 01-04-01062-CV, 2008 WL 2388073, at *4 (Tex. App.-Houston [1st Dist.] June 12, 2008, no pet.) (mem. op.) (citing *Dunn*, 592 S.W.2d at

was not "hotly contested" and the evidence was not "sharply conflicting." A review of the record proves otherwise. Accordingly, we sustain Moore's first issue.

\* \* \*

For the foregoing reasons, we reverse the trial court's judgment, render a take-nothing judgment in favor of Moore on Altra's fraud claim, and remand for a new trial in accordance with this opinion on the remaining claims.

921). In *Van Allen*, we concluded if the evidence was "sharply conflicting" then nothing more was needed to show reversible error. 35 S.W.3d at 66. Nevertheless, we noted that there was a motion for summary judgment, which was denied; twenty-one questions submitted to the jury; and a motion for a directed verdict, which was denied. *Id.*